UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


NEW YORK LIFE INSURANCE       :
COMPANY,       :
      Plaintiff,       :
      :
      v.       :       C.A. No. 14-74S
      :
MASSIEL ORTIZ and JULIA KLAH,       :
      Defendants.       :


**REPORT AND RECOMMENDATION**

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff New York Life Insurance Company ("New York Life") seeks to interplead a $250,000 death benefit on a life insurance policy issued to Gandy S. Kaydea, a popular rap performer, who was murdered on March 20, 2013, at the age of twenty-two. As stakeholder, New York Life joined the primary policy beneficiary, Massiel Ortiz, Mr. Kaydea's former girlfriend and a resident of Rhode Island, and the secondary beneficiary, Julia Klah, Mr. Kaydea's mother and a resident of Pennsylvania.[1] New York Life contends that Ms. Ortiz and Ms. Klah have conflicting claims, in that Ms. Ortiz remains a "person of interest" in the unsolved murder and therefore potentially ineligible for the death benefit under Rhode Island's Slayer Statute, R.I. Gen. Laws § 33-1.1-2.[2] Ms. Ortiz counterclaimed against New York Life, arguing that its failure to pay the death benefit to her constitutes breach of contract, breach of the covenant of good faith and fair dealing and bad faith, as well as that its parallel contestability

---

[1] The diversity of citizenship between Ms. Ortiz and Ms. Klah, coupled with the amount in controversy, which well exceeds $500, creates jurisdiction in this Court over this action. 28 U.S.C. § 1335.

[2] Under Rhode Island's Slayer Statute, "[n]either the slayer nor any person claiming through him or her shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but the property shall pass as provided in this chapter." R.I. Gen. Laws § 33-1.1-2.

investigation, initiated because Mr. Kaydea was murdered less than four months after he purchased the policy, was conducted as a subterfuge to delay paying her the death benefit.

Pending before me are New York Life's motions for interpleader relief and summary judgment on Ms. Ortiz's counterclaims; it seeks to deposit the death benefit with the Court and to be dismissed from the suit. Ms. Ortiz objects to the motions, contending New York Life is a wrongdoer not entitled to interpleader relief because it manufactured the controversy over the policy and is guilty of laches. Ms. Klah has not objected to the motions.

For the reasons that follow, I find that the undisputed facts establish that New York Life is entitled to interpleader relief, though not at the interest rate it proposes and without an award of attorney's fees. I also find that Ms. Ortiz's counterclaims against it fail as a matter of law. Accordingly, I recommend that New York Life's motion for interpleader relief be granted in part and denied in part and that its motion for summary judgment on Ms. Ortiz's counterclaims be granted.

## I.    FACTS[3]

On November 28, 2012, less than four months before his death, Mr. Kaydea completed an application for a $250,000 term life insurance policy; the application was accepted and the policy was issued by New York Life. SUF ¶¶ 1, 2. He named Ms. Ortiz as first beneficiary, entitled to a 100% share, and identified her as his "Intended Spouse" on the insurance application. SUF ¶¶ 2, 4. Ms. Ortiz had been Mr. Kaydea's girlfriend; they had lived together for four to five months in early 2012, and had a child together. SUF ¶ 20. However, they had not lived together for months when Mr. Kaydea applied for the life insurance and they had not

---

[3] Except as otherwise noted, these are the undisputed facts laid out in the parties' respective statements of undisputed facts ("SUF").

been "on speaking terms . . . for a while" at the time of his death. SUF ¶ 20. Mr. Kaydea named his mother, Ms. Klah, as the second (contingent) beneficiary on the policy. SUF ¶ 2.

On March 20, 2013, Mr. Kaydea's body was discovered engulfed in flames at a cemetery in Cranston, Rhode Island. SUF ¶ 5. The medical examiner's office announced that he died from ligature strangulation before his body was set afire; Cranston police believed the death was gang-related. SUF ¶ 5. Within three weeks of the death, New York Life was contacted by law enforcement seeking information about the policy. SUF ¶¶ 6-7. On April 29, 2013, Ms. Ortiz submitted a claim for the death benefit. SUF ¶ 8.

Because Mr. Kaydea's death occurred so soon after he applied for the policy, well within the contestability period[4] (the first two years of the policy), New York Life commenced a routine[5] contestability investigation to decide if it would pay the death benefit or seek to rescind the policy based on any material misrepresentations that its investigation might uncover in Mr. Kaydea's insurance application. See SUF ¶ 9. Promptly upon receipt of her claim, on May 2, 2013, New York Life advised Ms. Ortiz that it was conducting a contestability investigation, that Mr. Kaydea's medical records would be required as part of that investigation and that its investigator would contact her. SUF ¶ 10. The contestability investigation focused on the representations that Mr. Kaydea made on his application, as well as on the circumstances of his

---

[4] The contestability period is a fixed span of time (here two years) after the policy issues. If death occurs within that period, the insurer may perform an investigation to determine whether the insured made a material misrepresentation on the application that might give rise to the right to contest coverage; if death occurs after the contestability period, the insurer cannot contest coverage based on misrepresentations in the application. See Minn. Mut. Life Ins. Co. v. Ricciardello, No. 3:96CV2387 (AHN), 1997 WL 631027, at *2 (D. Conn. Sept. 17, 1997). When death occurs within the contestability period, a contestability investigation is a routine practice; further, insurers are entitled to a reasonable amount of time to conduct an investigation to determine whether there is any basis to decline paying the death benefit. See Downs v. River City Grp., LLC, No. 3:11-cv-00885-LRH-WGC, 2013 WL 4506141, at *3 (D. Nev. Aug. 22, 2013) ("contestability investigations are routine" and are "a customary practice in the insurance field").

[5] The parties do not dispute that New York Life's contestability investigation was routine when it began. Ms. Ortiz disputes that it remained routine as it progressed. Since the parties do not disagree on the material events that comprise the contestability investigation, their dispute over whether it remained "routine" is not material.

death.  SUF ¶ 9.  In connection with its contestability investigation, New York Life set out to procure Mr. Kaydea's school, pharmacy, medical and criminal records.  SUF ¶ 17.  Ms. Ortiz contends that New York Life repeatedly encouraged her to continue to try to get the medical records, while acknowledging her as the "sole beneficiary" on the policy.  SUF ¶ 27.  The only reason she was given by New York Life for its failure to pay her the death benefit was her inability to secure the medical records.  SUF ¶ 31.

This contestability investigation continued through the rest of 2013.  New York Life's claim file reflects that it proceeded diligently by trying to collect the necessary records from a variety of sources,[6] not just by asking Ms. Ortiz to assist.  Further, until January 2014, there is no indication that Ms. Ortiz objected to New York Life's request that she assist in procuring Mr. Kaydea's medical records.[7]  Rather, she set out to try to get herself appointed as his executrix so that she could get the authorizations necessary to get the records New York Life needed.  SUF ¶ 16.  In early October 2013, her prior attorney contacted New York Life and informed it that he had been engaged to probate Mr. Kaydea's estate for that purpose.  SUF ¶ 16.  However, Ms. Ortiz's efforts were not successful.  In addition, New York Life's attempts to gather contestability records from other sources were foiled; for example, the police refused to release any information due to the ongoing criminal investigation.  SUF ¶ 18.  Finally, on December 31, 2013, Ms. Ortiz told New York Life that she could not get estate papers and would be unable to

---

[6] New York Life's claim file reflects its persistent efforts to get the records needed to perform the contestability investigation: it initially tried to get medical records directly from providers but failed because it did not know who they were; it tried to get assistance from Ms. Klah, but she refused; it tried to get information about any criminal history from law enforcement and medical information from the coroner's report but was refused because of the open criminal investigation; it unsuccessfully tried to get motor vehicle records; it explored internally whether there might be other ways to develop a medical history and verify school records; and it repeatedly urged Ms. Ortiz to assist with procuring the medical records.  ECF Nos. 17-2 at 17-18, 22, 40; 17-3 at 2, 6-7, 35-36, 39, 61; 17-4 at 4, 9, 11, 14, 20, 23; see ECF No. 17 at 1-6 (affidavit of New York Life corporate vice president authenticating claim file).

[7] Ms. Ortiz raised the objection – that medical records cannot be relevant to contestability when the insured has been murdered – for the first time in a letter from her new attorney to New York Life dated January 8, 2014, in which he stated, "I want to raise herein an issue that I do not believe has been addressed . . . ."  ECF No. 1-5 at 2.

sign any authorizations for the records needed for the contestability investigation. SUF ¶ 21. In her Affidavit, she claims that, because she was not married to Mr. Kaydea, it proved extremely difficult, expensive, and ultimately impossible for her to procure the medical records requested by New York Life. Ortiz Aff. ¶ 16.

Meanwhile, within days after the May 2, 2013, letter advising Ms. Ortiz that it would be conducting a contestability investigation, New York Life learned from police that "the homicide is an open active investigation" and that "they cannot rule anyone out." SUF ¶ 11. By May 21, 2013, New York Life became aware that police considered "the family members and beneficiary" as persons of interest in the case; in addition, law enforcement asked New York Life to contact the police if it should decide to pay out the policy. SUF ¶ 12. In September 2013, New York Life's agent reported on an attempt to reach Mr. Kaydea's mother, Ms. Klah,[8] but she refused to speak to him, declaring in anger that "no one is going to benefit from the death of my son." SUF ¶ 13. New York Life also learned that Ms. Klah had retained a Rhode Island attorney and an investigator to examine the circumstances of her son's death. SUF ¶¶ 13-14. Inquiries addressed to the police in September through December 2013 resulted only in confirmation that Mr. Kaydea's death remained an open homicide investigation and that no one had been ruled out. SUF ¶¶ 15, 19.

It is undisputed that New York Life, despite repeated contact with her regarding its contestability investigation and need for Mr. Kaydea's medical records, never told Ms. Ortiz that it was also concerned that she might have been involved with the murder so that the Slayer Statute might defeat her claim to the $250,000 death benefit. Specifically, it never told her that it was "conduct[ing] investigation to rule out beneficiary involvement." SUF ¶ 30; ECF No. 17-3

---

[8] The record does not reveal when Ms. Klah learned that she is the contingent beneficiary named in the life insurance policy, and therefore entitled to the $250,000 death benefit if the primary beneficiary, Ms. Ortiz, is found to be ineligible under the Slayer Statute.

at 41.  Rather, the only reason she was ever given for the delay in paying the entire amount to her was her inability to secure the medical records.  SUF ¶ 31.  It is also undisputed that Ms. Klah never made a claim for the death benefit until she filed the cross-claim against Ms. Ortiz in this litigation.  SUF ¶ 28; ECF No. 5 ¶ 20.

In January 2014, the matter came to a head.  Ms. Ortiz engaged a new attorney who challenged New York Life's contestability investigation, arguing that the medical records are irrelevant to contestability because Mr. Kaydea had been murdered, and demanding that it pay the death benefit to her within five business days.  SUF ¶ 22.  With almost none of the records that it had been seeking for the contestability investigation and confirmation from the police that the homicide investigation of Mr. Kaydea's death remained "an active investigation no one can be ruled out at this time," SUF ¶ 23, New York Life terminated the contestability investigation, ending its right to contest that the death benefit is payable.  SUF ¶¶ 23-24.  Unable to resolve the conflicting claims of Ms. Ortiz and Ms. Klah to the death benefit because of the Slayer Statute, it commenced this interpleader action on February 7, 2014.  SUF ¶ 25.  Its complaint acknowledging that it "is ready, willing and able to disburse" the death benefit was filed nine months after Ms. Ortiz submitted her claim and ten months after Mr. Kaydea was murdered.  ECF No. 1 ¶ 31.

## II.     PROCEDURAL HISTORY

New York Life initiated this federal suit with an interpleader complaint pursuant to Fed. R. Civ. P. 22 and 28 U.S.C. § 1335, seeking to require Ms. Ortiz and Ms. Klah to settle amongst themselves their rights to the death benefit.  ECF No. 1.  In Count I, New York Life alleges it has a reasonable fear of competing claims that might expose it to multiple liability and requests

permission to deposit the proceeds in the Court's Registry. Count II alleges that it is entitled to its attorney's fees and costs associated with the prosecution of its interpleader suit.

Ms. Ortiz's responsive pleading objected to interpleader relief and counterclaimed against New York Life for breach of contract, breach of the obligation of good faith and fair dealing, negligence, misrepresentation/omission, bad faith claims settlement practices and unfair or deceptive trade practices; she seeks an award of attorney's fees under R.I. Gen. Laws § 9-1-45. ECF No. 2. Ms. Klah's answer assented to New York Life's request for interpleader relief, objecting only to its request for attorney's fees and costs. Ms. Klah cross-claimed against Ms. Ortiz, alleging that she (Ms. Klah) is "seeking that the life insurance proceeds should be directly paid to her" and asking this Court for an "evidentiary determination of the applicability of [the Slayer Statute]." ECF No. 5 Cross-Claim ¶¶ 19-20.

New York Life now moves for interpleader relief to deposit the death benefit into the Court's Registry, with interest calculated at 1% from the date of Mr. Kaydea's death, to be dismissed from the case, to enjoin Ms. Ortiz and Ms. Klah from bringing a related action in another forum and to recoup its fees and costs for prosecuting the interpleader.[9] New York Life also moves for summary judgment on the merits of Ms. Ortiz's counterclaims. Ms. Ortiz objects to both of New York Life's motions – she opposes the interpleader and the dismissal of her counterclaims, she seeks an order that interest be calculated at 19% and she asks the Court to deny New York Life's request for its fees and costs. Ms. Klah has not filed an objection.

## III. LAW AND ANALYSIS

### A. <u>Interpleader</u>

---

[9] New York Life's interpleader motion also asks this Court to set a briefing schedule to initiate the second phase of the interpleader action. I decline this invitation – this Court has already set a schedule for the case, which was recently extended at the request of Ms. Ortiz and Ms. Klah.

"Interpleader is a device which was developed to protect a party against being 'caught in the middle'; one rightfully in possession of property, confronted with two or more competitors who demand that property, ought not be forced to evaluate the opposing claims at its peril." Equitable Life Assur. Soc. v. Porter-Englehart, 867 F.2d 79, 89 (1st Cir. 1989).  It allows a stakeholder who admits it is liable to one of the claimants, but fears the prospect of multiple liability, to file suit, deposit the property with the court, and withdraw from the proceedings. Prudential Ins. Co. of Am. v. Hovis, 553 F.3d 258, 262 (3d Cir. 2009).  An interpleader action typically involves two stages: first, the court decides whether the stakeholder is entitled to interpleader and dismissal; second, the claimants left in the suit litigate their rights to the disputed property.  Rhoades v. Casey, 196 F.3d 592, 600 (5th Cir. 1999).  Federal procedure provides for two types of interpleader: "rule interpleader" and "statutory interpleader," both of which have been invoked by New York Life.  See 4 Moore's Fed. Prac. § 22.04 (2014). Statutory interpleader is grounded in 28 U.S.C. § 1335, which creates jurisdiction when the amount in dispute is over $500 and the matter involves diverse claimants who "are claiming or may claim" entitlement to the disputed funds.  Rule interpleader is governed by Fed. R. Civ. P. 22, which allows an interpleader for "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead."  Fed. R. Civ. P. 22.

While interpleader relief is not automatic, it is to be granted liberally.  Abex Corp. v. ABC Rail Corp., 158 F.R.D. 75, 78 (W.D. Pa. 1994) (citing State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 533 (1967)).  "[I]t is immaterial whether the stakeholder believes that all claims against the fund are meritorious;" as long as the evidence establishes the threat of multiple litigation, interpleader relief is available even if one of the claims is tenuous and does not create the likelihood of duplicative liability.  Equitable Life, 867 F.2d at 84.  However,

interpleader relief is an equitable remedy not available to a wrongdoer; "[i]t is the general rule that a party seeking interpleader must be free from blame in causing the controversy, and where he stands as a wrongdoer with respect to the subject matter of the suit or any of the claimants, he cannot have relief by interpleader." Farmers Irrigating Ditch & Reservoir Co. v. Kane, 845 F.2d 229, 232 (10th Cir. 1988). Farmers Irrigating Ditch illustrates the kind of "wrongdoer" that may not avail itself of interpleader relief – the putative stakeholder was a ditch company whose admitted negligent maintenance of a reservoir had caused a catastrophic flood resulting in death and great property damage. The court held that such a "tortfeasor cannot obtain protection in an action in the nature of interpleader against the consequences of its own wrong." Id.

Ms. Ortiz contends that New York Life is not entitled to interpleader relief because it is not an innocent stakeholder, but rather is a "wrongdoer." In support of this claim, she asserts that New York Life created the controversy because the police have merely identified her as a person of interest in an open investigation of the murder and have not formally charged her, and because Ms. Klah did not file a pre-litigation claim for the death benefit. She also argues that New York Life may not have interpleader relief because it is guilty of laches in the way that it continued its pointless contestability investigation long after the irrelevance of the medical records had become obvious, causing a delay of nine months from receipt of her claim before it committed to pay the death benefit and filed the interpleader.

Ms. Ortiz's argument that the controversy was manufactured by New York Life because she was never charged with the murder and the investigation remains open is unavailing. An insurer does not need conclusive proof that a beneficiary is a slayer to face a sufficient threat of multiple litigation to permit the filing of an interpleader; rather, it is enough that the insured died under suspicious circumstances, the investigation remains open and the primary beneficiary has

not been eliminated as a suspect.  Butterfly-Biles v. State Farm Life Ins. Co., No. 09-CV-0086-

CVE-PJC, 2010 WL 346839, at *7 (N.D. Okla. Jan. 21, 2010).  Otherwise, "slayers could

overcome prohibitions on their ability to wrongfully receive benefits simply by filing claims

before the relevant murder investigations concluded."  Id. at *7 n.18.  Courts routinely allow

interpleader merely because the intended beneficiary has not been ruled out by an ongoing

criminal investigation.  See Stonebreaker v. Pruco Life Ins. Co., No. 11cv871 WQH (WVG),

2011 WL 5362067, at *3 (S.D. Cal. Nov. 4, 2011) (interpleader proper where primary

beneficiary has not been ruled out as a suspect); United Investors Life Ins. Co. v. Grant, No.

2:05-CV-1716-MCE-DAD, 2006 WL 2308286, at *2 (E.D. Cal. Aug. 9, 2006) (same).  Far from

imposing a Hobson's choice on life insurers, as Ms. Ortiz argues, courts have held that the life

insurer has a "duty to clothe its disbursement of the proceeds of the policy with the protection of

judicial determination" by commencing the interpleader action.  Monumental Life Ins. Co. v.

Lyons-Neder, 140 F. Supp. 2d 1265, 1273 (M.D. Ala. 2001) (life insurer faced with claim by

primary beneficiary who had not been ruled out as a suspect in the murder of the insured

properly commenced interpleader).  Consistent with these decisions, the Rhode Island Supreme

Court has made clear that the Slayer Statute should be interpreted broadly to effectuate its

remedial purpose.  Swain v. Estate of Tyre, 57 A.3d 283, 292-93 (R.I. 2012).

Similarly, the fact that a contingent beneficiary like Ms. Klah did not file a death benefit

claim with New York Life is not legally significant – the threat of a future claim is enough to

trigger the right to interpleader relief.  See United States v. Major Oil Corp., 583 F.2d 1152,

1157 (10th Cir. 1978); Truck-A-Tune, Inc. v. Re, 856 F. Supp. 77, 80 (D. Conn. 1993) (citing

Bell v. Nutmeg Airways Corp., 66 F.R.D. 1, 4 (D. Conn. 1975)); 4 Moore's Fed. Prac. §

22.03[1][e] (2014).  The pivotal issue is not whether Ms. Klah filed a claim, but whether her

potential claim has enough heft to justify resort to an interpleader. Stonebreaker, 2011 WL 5362067, at *3 (where primary beneficiary has not been ruled out as a suspect, lack of any claim by contingent beneficiaries is not impediment to interpleader as long as they did not disavow their potential claims); see United Investors Life Ins. Co., 2006 WL 2308286, at*2 (existence of potential claimants creates factual uncertainty so that interpleader proceeds, even though no other claims have been made). Here, the undisputed facts clearly establish competing claims – confirmed by the joining of the issue in this litigation in which both Ms. Ortiz and Ms. Klah now assert claims to the $250,000 death benefit.

Finally, Ms. Ortiz's laches argument – that New York Life's nine-month delay in filing its interpleader action is a reason to deny its interpleader motion – is inconsistent with the equitable principles in play in this case. Effectively, Ms. Ortiz contends that New York Life should not be allowed interpleader relief because it should not have conducted a contestability investigation, but rather should have paid Ms. Ortiz immediately. She cites no cases to support this proposition, which lacks logic in that New York Life was also waiting out the criminal investigation and promptly filed the interpleader after ending its contestability investigation and confirming that the criminal investigation remained open and that no one (including Ms. Ortiz) had been ruled out. The rare circumstance where interpleader relief is appropriately denied based on laches arises when there has been a significant delay after the claimant's entitlement to the fund became unambiguously clear, with laches confirmed by the evaporation of the potential conflicting claim. See Mendez v. Teachers Ins. & Annuity Ass'n & Coll. Ret. Equities Fund, 982 F.2d 783, 788 (2d Cir. 1992).

Courts facing similar circumstances have allowed interpleader relief without regard to such a period of delay. See, e.g., Stonebreaker, 2011 WL 5362067, at *1-2 (fifteen-month delay

from murder of insured while investigation open not impediment to interpleader); <u>Monumental Life Ins. Co.</u>, 140 F. Supp. 2d 1265, 1267-68 (eleven-month delay from submission of claim while criminal investigation remained open not impediment to interpleader). Indeed, once the insurer has notice that the primary beneficiary is a potential suspect in the murder of the insured, courts find that it has a duty to delay payment and investigate. <u>Harper v. Prudential Ins. Co. of Am.</u>, 662 P.2d 1264, 1273-74 (Kan. 1983); <u>see also</u> <u>Am. Gen. Life Ins. Co. v. Broughton</u>, No. CV 06-0488-S-MHW, 2008 WL 4977402, at *4 (D. Idaho June 3, 2008) (death during incontestability period gives insurer right to "reasonable opportunity to investigate"). Moreover, only a delay past the point where it is clear that the claim is covered is potentially wrongful. <u>See Ressler v. Gen. Am. Life Ins. Co.</u>, 561 F. Supp. 2d 691, 695 (E.D. Tex. 2007) (delay for contestability investigation when death was caused by illness not disclosed in application is reasonable). And here the undisputed evidence establishes that New York Life was diligent in its pursuit of both its contestability investigation and its Slayer Statute investigation; Ms. Ortiz does not suggest that it was not.

In sum, the undisputed facts make clear that New York Life had a reasonable basis to conclude that Ms. Ortiz remains a person of interest in the open criminal investigation of Mr. Kaydea's murder and that Ms. Klah had a sufficiently-hefty potential claim, which has now been asserted, to 100% of the death benefit. <u>See Equitable Life</u>, 867 F.2d at 84. As such, New York Life faces a threat of double liability or multiple lawsuits if it pays out the death benefit and is entitled to interpleader relief as requested in Count I of the interpleader complaint. Further, Ms. Ortiz has failed to present any evidence establishing that New York Life is a wrongdoer so as to present an impediment to its request for interpleader relief. Based on the foregoing, I recommend that New York Life is entitled to interpleader relief.

**B.  Summary Judgment**

New York Life's motion for summary judgment asks this Court to dismiss all of Ms. Ortiz's counterclaims accusing it of bad faith, breach of contract, negligence, misrepresentation and deception based its failure promptly to pay her the $250,000 death benefit, the protraction of its contestability investigation past the point of reasonableness and its failure to advise her that it was monitoring the criminal investigation to determine how to proceed in light of the Slayer Statute.  It lays out two paths to this goal.  First, New York Life argues that Ms. Ortiz's counterclaims boil down to a single theme – that she should have been paid the proceeds immediately after she made her claim because the insurer should have terminated its routine contestability investigation as soon as it saw the cause of death ("strangled by another(s) using ligature") and that it should have ignored the open criminal investigation and her status as a "person of interest" in connection with Mr. Kaydea's murder.  New York Life asserts that such claims cannot be sustained as a matter of law against a stakeholder eligible for interpleader relief in reliance on the seminal decision in <u>Prudential Ins. Co. v. Hovis</u>, 553 F.3d 258 (3d Cir. 2009).  Second, New York Life contends that the undisputed facts establish that each claim, viewed individually, fails as a matter of law.

1.  Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  <u>Taylor v. Am. Chemistry Council</u>, 576 F.3d 16, 24 (1st Cir. 2009); <u>Commercial Union Ins. Co. v. Pesante</u>, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  A fact is material if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the

fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)). It is error to grant summary judgment by drawing inferences in favor of the moving party; rather, the non-moving party's facts should be properly credited. Tolan v. Cotton, 134 S. Ct. 1861, 1866-68 (2014). The evidence must be in a form that permits the court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

> 2.      Ms. Ortiz's Counterclaims

Normally, when a claimant to a fund brings an independent counterclaim against the stakeholder, the interpleader may be allowed and the funds deposited, but the stakeholder remains in the litigation to defend the counterclaim. Hovis, 553 F.3d at 264. However, in Hovis, the court held that, when all of the counterclaims rest on the insurer's failure to resolve an ongoing investigation in favor of the claimant and promptly to pay the death benefit, they run counter to the very concept of interpleader. Id. at 265; see Bierman v. Marcus, 246 F.2d 200, 202 (3d Cir. 1957) ("[A] stakeholder [should] not [be] obliged at his peril to determine which claimant has the better claim . . . ."). Rather, a stakeholder's failure to choose between adverse claimants cannot breach any legal duty. Hovis, 553 F.3d at 265 (citing Lutheran Bhd. v. Comyne, 216 F. Supp. 2d 859, 862-63 (E.D. Wis. 2002)). In such circumstances, the counterclaims must be dismissed based on no more than the court's decision to allow the

interpleader.  <u>Hovis</u>, 553 F.3d at 264-65 (all counterclaims based on who is entitled to life insurance proceeds dismissed based on finding that stakeholder entitled to interpleader).  As a practical matter, the <u>Hovis</u> court dismissed all counterclaims based on bad faith, breach of contract, breach of fiduciary duty, unfair trade practices and negligence because they arose from the insurer's investigation and the resulting delay in payment to the primary beneficiary during which the alternative beneficiary discovered the issue and asserted a claim.  <u>Id.</u> at 260-61.  Put differently, when a counterclaim simply repackages a claim that a beneficiary is entitled to the death benefit, the stakeholder should be granted both interpleader relief and dismissal from the suit.  <u>See</u> <u>Lexington Ins. Co. v. Jacobs Indus. Maint. Co., LLC</u>, 435 F. App'x 144, 148-49 (3d Cir. 2011).

    <u>Hovis</u> has become a foundational decision, relied on by other courts in this Circuit and elsewhere.  <u>See, e.g.</u>, <u>J.G. Wentworth Originations, LLC v. Mobley</u>, 11-CV-1406, 2012 WL 4922862, at *5-7 (D. Md. Oct. 12, 2012) (claimant may assert counterclaim against the stakeholder for causing dispute but not for failing to resolve the controversy in claimant's favor; citing <u>Hovis</u> with approval); <u>Sun Life Assur. Co. of Can. v. Plaisted</u>, Civil No. 09–cv–108–SM, 2009 WL 3335867, at *5 (D.N.H. Oct. 15, 2009) (to pursue counterclaim in interpleader action, counterclaim plaintiff must demonstrate that claim is "truly independent" of underlying dispute over entitlement to funds; citing <u>Hovis</u> with approval).  However, Ms. Ortiz argues correctly that <u>Hovis</u> does not hold that interpleader is a talisman against liability; rather, <u>Hovis</u> itself and the post-<u>Hovis</u> cases are clear that it is not a "get-out-of-jail-free" card, mandating dismissal of all counterclaims.  <u>Hovis</u>, 553 F.3d at 265.  For example, in <u>Lee v. West Coast Life Insurance Co.</u>, 688 F.3d 1004, 1007, 1012 (9th Cir. 2012), the court cited <u>Hovis</u> with approval and granted interpleader relief, but refused to dismiss a counterclaim sounding in negligence based on the

claim that the insurer had botched the handling of the change of beneficiary forms. Thus, having

found that New York Life is an innocent stakeholder, entitled to interpleader relief, the task for

this Court now is to determine whether Ms. Ortiz's counterclaims are "truly independent of who

[is] entitled to the life insurance proceeds." Hovis, 553 F.3d at 264.

Ms. Ortiz's counterclaims based on New York Life's failure to pay the death benefit to

her immediately upon receipt of her claim – breach of contract (Count I), breach of the

obligation of good faith and fair dealing (Count II), bad faith (Count V) and for attorney's fees

based on breach of contract (Count VII) – all fall squarely within the zone that Hovis has carved

out as inconsistent with interpleader relief. Each of them is premised on the contention that New

York Life's delay based on the ongoing criminal investigation and its decision to file the

interpleader are wrongful. Each of them seeks damages based on the failure promptly to pay her

the death benefit. Accordingly, they are inconsistent with interpleader relief, which amounts to

payment of the benefit, and should not be the basis for holding New York Life in this suit. See

Butterfly-Biles, 2010 WL 346839, at *5 (filing interpleader after delay due to open criminal

investigation does not constitute denial of claim or refusal to pay; summary judgment

appropriate on breach of contract and bad faith claims). I recommend that each of them be

dismissed.[10]

Ms. Ortiz's counterclaims for negligence (Count III), misrepresentation (Count IV) and

unfair or deceptive practices (Count VI) require a more nuanced analysis. They are principally

---

[10] Alternatively, they are also subject to dismissal for failure to state a claim when analyzed individually. New York Life's refusal to pay the death benefit is not a material breach of contract (Count I) or of the duty of good faith and fair dealing (Count II) because the contract expressly permitted it to investigate Mr. Kaydea's death. Similarly, her claim for attorney's fees under R.I. Gen. Laws § 9-1-45 (Count VII) is derivative of the contract claim and therefore also fails. See Ross–Simons of Warwick, Inc. v. Baccarat Inc., 66 F. Supp. 2d 317, 331 (D.R.I.1999) (§ 9-1-45 requires a complete absence of a justiciable issue of either law or fact). Ms. Ortiz's bad faith settlement claim fails (Count V) because New York Life has neither denied the claim nor refused payment without a reasonable basis in fact or law. Imperial Cas. & Indem. Co. v. Bellini, 947 A.2d 886, 893 (R.I. 2008); Lewis v. Nationwide Mut. Ins. Co., 742 A.2d 1207, 1209 (R.I. 2000). To the contrary, the interpleader is an acknowledgment of the duty to pay.

based on her claim that New York Life sent her on a wild goose chase for medical records that it knew were irrelevant to the contestability investigation that it told her (falsely she claims) was the only reason for delay. She claims that, once New York Life accepted that Mr. Kaydea had died by strangulation, it knew that a health condition not disclosed on his application could not have contributed to his death. Accordingly, she charges that the medical record that New York Life pushed her to procure for nine months had no conceivable relevance to "the contingency or event which [caused] the policy . . . to become due and payable." R.I. Gen. Laws § 27-4-10. Unaware that the medical record demand was a ruse because New York Life's real concern was that the Slayer Statute might disqualify her, she dutifully tried to obtain the records at great personal expense. These claims give rise to potential damages other than the $250,000 death benefit (such as her expenses in trying to procure the medical records); accordingly, they may be asserted against New York Life, despite its status as an innocent stakeholder, unless the undisputed facts establish that they otherwise fail as a matter of law. See Lee, 688 F.3d at 1012.

The starting point for the analysis is the clear right of New York Life to initiate a routine contestability investigation and to take a reasonable amount of time to conduct it, which the undisputed facts establish is what it did. See Downs v. River City Grp., LLC, No. 3:11-cv-00885-LRH-WGC, 2013 WL 4506141, at *1, 4 (D. Nev. Aug. 22, 2013) (routine contestability investigation, with prompt request for medical records and prompt decision upon receipt does not support claim); Matilla v. Farmers New World Life Ins., 960 F. Supp. 223, 224 (N.D. Cal. 1997) (contestability investigation is routine); Mass. Mut. Life Ins. Co. v. Leberis, 595 F. Supp. 157, 158 (N.D. Ill. 1984) (routine contestability investigation involves procurement of medical records). The undisputed facts also establish that the contestability investigation focused broadly not only on Mr. Kaydea's medical conditions, but also on any criminal charges to which he

might have been exposed, all of which were covered by the application he filled out. It cannot logically be asserted that there was no good faith basis for such an investigation: for example, it is conceivable that the medical records might well have revealed information about gang involvement or that Mr. Kaydea had a terminal illness and possibly arranged his own death to look like a murder. In the immediate aftermath of a death allegedly based on murder, one can speculate endlessly about material revelations that might have emerged from a comprehensive contestability investigation. And Ms. Ortiz does not dispute that the contestability investigation was appropriate at the outset (so that the initial request for medical records was not wrongful).

With the good faith commencement of the contestability investigation undisputed, Ms. Ortiz's counterclaims based on negligence, misrepresentation and deception depend on proof that this innocent investigation morphed into a fraud over time. Fatal to this theory is the lack of any concrete facts to support it. Despite access to New York Life's entire claim file,[11] including all of its internal notes reflecting its efforts to gather the records needed for the contestability investigation, Ms. Ortiz rests her claim that the contestability investigation became a sham on one slim reed – the cause of death in the death certificate. From that alone, she argues that this Court may infer that, as time passed, New York Life came to realize that the medical records could not be relevant yet continued to press her to procure them.

While this Court is obliged to draw all inferences in favor of Ms. Ortiz as the non-moving party, such inferences must be reasonable. Here, the facts permit the inference only that, as time passed and the information New York Life knew about Mr. Kaydea's death solidified, the likelihood of discovery of a material misrepresentation became gradually more remote, culminating in New York Life's decision in January 2014, to terminate the contestability

---

[11] On October 7, 2014, Ms. Ortiz moved to compel production of documents in the claim file that New York Life withheld based on the attorney-client privilege. ECF No. 32. After *in camera* review of all of the records, this Court determined that all of them were protected by attorney-client privilege and denied the motion. ECF No. 35.

investigation.  Ms. Ortiz points to no facts tending to establish that New York Life came to that conclusion, or should have come to that conclusion, at some earlier point.  Instead, the undisputed evidence establishes that, throughout 2013, Ms. Ortiz and her counsel accepted the need to procure the medical records and assured New York Life that a probate proceeding was being initiated to accomplish that goal.  Further, New York Life itself was actively trying to get the medical and other contestability records, right up until her new attorney raised – for the first time – "an issue that I do not believe has been addressed."  ECF No. 1-5 at 2.  Examining these facts in the light most favorable to Ms. Ortiz permits the inference only that, promptly upon being presented with his argument that the medical records cannot be relevant in light of the cause of death, New York Life terminated the contestability investigation and filed the interpleader.

The other foundation for Ms. Ortiz's counterclaims is misrepresentation based on New York Life's failure to disclose its parallel Slayer Statute investigation.  To establish deception, Ms. Ortiz alleges that New York Life told her that the contestability investigation was the cause of the delay in paying her the death benefit and failed to inform her that the Slayer Statute investigation was also a reason.  She has cited no authority for imposing an affirmative duty on an insurer to disclose that a policy beneficiary is a murder suspect and might not receive the death benefit for that reason; her argument flies in the face of cases rejecting a duty to disclose completing claims or the possibility of any interpleader.  See Michelman v. Lincoln Nat'l Life Ins. Co., 685 F.3d 887, 901 (9th Cir. 2012) (failure to disclose competing claims that created possibility of interpleader not actionable because no duty to disclose).  Public policy and the remedial purpose of the Slayer Statute also auger against the creation of such a duty.  See Swain, 57 A.3d at 292-93; cf. Am. Gen. Life Ins. Co. v. Futrell, No. 2:11-cv-00977-PMP-CWH, 2012

WL 1931239, at *3 (D. Nev. May 8, 2012) (insurer's delay in asserting slayer interpleader while keeping in close touch with police appropriate and not wrongful). Without such a duty, the undisputed facts rule out actionable misrepresentation or deception.

In summary, Ms. Ortiz's negligence claim (Count III) is not viable because the undisputed facts establish no bad faith or breach of any duty of care in New York Life's handling of its contestability investigation. Nor has Ms. Ortiz presented any facts to prove that New York Life committed an actionable misrepresentation or omission (Count IV). Finally, her claim based on the Deceptive Trade Practices Act (Count VI) fails not only for the lack of an actionable deception, but also because life insurance is regulated extensively by the Department of Business Regulation and therefore outside the purview of R.I. Gen. Laws § 6-13.1-1. State v. Piedmont Funding Corp., 382 A.2d 819, 822 (R.I. 1978).

              3.      Interest Rate

New York Life contends it should pay 1% interest on the $250,000 death benefit from the date of Mr. Kaydea's death. Ms. Ortiz counters that the interest rate should be 19%, comprised of 9% as required by R.I. Gen. Laws § 27-4-26, plus an additional 10% as specified in the policy. The parties' competing positions find their genesis in Section 6.1(a)-(b) of the policy. Section 6.1(a) provides that, from the date of Mr. Kaydea's death, "[i]nterest will accrue at the rate set by the company for interest credited on death benefit proceeds." New York Life interprets this language as giving it the choice to set the rate at 1%, while Ms. Ortiz construes R.I. Gen. Laws § 27-4-26 as trumping that provision of the policy and requiring New York Life to pay 9%. Section 6.1(b) calls for an additional 10% that starts running thirty-one days after New York Life receives (i) proof of death, (ii) sufficient information to determine its liability and appropriate payee entitled to the proceeds, or (iii) "[t]he date that legal impediments to payment of proceeds

that depend on the action of parties other than us are resolved and sufficient evidence of the same is provided to us." The parties disagree on whether any "legal impediments" exist under Section 6.1(b) that would relieve New York Life of paying the additional 10%.

In support of its argument that the correct base interest rate is 1%, New York Life labors to avoid the plain language of § 27-4-26, which requires interest at 9%. It begins by pointing to the final page of the policy, which provides that it "was approved under the Authority of the Interstate Insurance Product Regulation Commission and issued under the Commission standards." Next, it notes that Rhode Island participates in the Interstate Compact on Insurance Product Regulations, R.I.G.L. §§ 27-2.5-1, *et seq.*, including Article XVI of the Compact, codified at R.I. Gen. Laws § 27-2.5-2, which provides that "[n]othing herein prevents the enforcement of any other law of a compacting state," except that "[f]or any product approved or certified to the commission,[12] the rules, uniform standards and any other requirements of the commission shall constitute the exclusive provisions applicable to the content, approval and certification of such products." Because the Kaydea policy is consistent with the published standards of the commission, it is governed by the standard stating that, "[i]interest shall accrue at the rate or rates applicable to the policy for funds left on deposit or, if the company has not established a rate for funds left on deposit, at the Two Year Treasury Constant Maturity Rate as published by the Federal Reserve." IIPRC-L-04-I § 3(G)(2)(b) (Interstate Compact document New York Life relies upon). To the extent that the statute mandating 9%, § 27-4-26, conflicts with the Compact, New York Life argues that the statute codifying the Compact, § 27-2.5-2, controls; therefore, it has discretion to select an interest rate under Section 6.1(a) of Mr. Kaydea's policy. In this case, it chose 1%.

---

[12] The "commission" in the Compact refers to the Interstate Insurance Product Regulation Commission. R.I. Gen. Laws § 27-2.5-2.

New York's Life attempt to avoid the 9% interest required by § 27-4-26 suffers from two flaws. First, when a specific statute conflicts with a general statute, Rhode Island law dictates that precedence be given to the specific statute. Warwick Hous. Auth. v. McLeod, 913 A.2d 1033, 1036-37 (R.I. 2007). Section 27-4-26 is a specific statute that governs payment of interest on death proceeds. The Interstate Compact on Insurance Product Regulations is a general statute that does not mention the applicable interest rate for death benefit proceeds – it only requires "uniform standards" for "content, approval and certification" of insurance products. R.I. Gen. Laws § 27-2.5-2. The goal of the Interstate Compact is uniformity, but by its own terms it cannot "abrogate or restrict . . . state law relating to the construction of insurance contracts . . . ." R.I. Gen. Laws § 27-2.5-2 (Article XVI of Compact). The Compact also states that "[a]ll insurance products filed with individual states shall be subject to the laws of those states." R.I. Gen. Laws § 27-2.5-2 (Article XVI of Compact). To interpret the Compact as nullifying § 27-4-26 would certainly "abrogate or restrict" a specific state law.

The other flaw is the argument's sheer novelty. New York Life conceded at the hearing that it has found no cases or other authority to support this argument – and this Court has been similarly flummoxed. Under these circumstances, "[t]he First Circuit has cautioned that a plaintiff should not choose a federal forum when it seeks to assert a novel state law [theory]." Patterson v. Novartis Pharm. Corp., 909 F. Supp. 2d 116, 123 (D.R.I. 2012) (second alteration in original). The First Circuit has also warned that litigants who reject a state forum in order to bring suit in federal court cannot expect that new trails will be blazed. Id. Such is the case here. To the extent New York Life seeks a brave new interpretation of the Interstate Compact under Rhode Island law, it should have filed its interpleader in state court. See Kennedy v. Town of Billerica, 617 F.3d 520, 533 (1st Cir. 2010) ("A federal court, interpreting state law, is not the

appropriate place to adopt a novel and expansive view of . . . state law."). Accordingly, the Court finds that R.I. Gen. Laws § 27-4-26 controls and recommends that New York Life must pay 9% on the death benefit from the date of Mr. Kaydea's death.

The other interest dispute is over the 10% interest rate in Section 6.1(b) of the policy. Interest under Section 6.1(b)(iii) does not begin to accrue until after the date that "legal impediments to payment of proceeds" are resolved "that depend on the action of parties other than" New York Life. Under Section 6.1(b)(ii), New York Life must receive sufficient information to determine the appropriate payee. In this case, the undisputed facts demonstrate that "legal impediments" remain to be resolved. As recently as January 2014, police informed New York Life that the murder investigation remains open and active and "no one can be ruled out at this time;" as a result, New York Life faces competing claims between Ms. Ortiz and Ms. Klah. When an insurance policy is clear and unambiguous on its face, judicial construction ends and the terms of the contract must be applied as written. Merrimack Mut. Fire Ins. Co. v. Dufault, 958 A.2d 620, 625 (R.I. 2008). Because it is clear that legal impediments remain to payment of the policy, I recommend that this Court find that New York Life is not obliged to add the 10% interest specified in Section 6.1(b).

C.     Attorney's Fees and Costs

Based on Count II of its interpleader complaint, New York Life seeks leave to deduct $12,399 in attorney's fees and $491.16 in costs from the death benefit that will be deposited into the Court's Registry. A federal court "has discretion to award costs and counsel fees to the stakeholder in an interpleader action . . . whenever it is fair and equitable to do so." Sun Life Assur. Co. of Can. v. Sampson, 556 F.3d 6, 8 (1st Cir. 2009) (alteration in original). The general rule is that attorney's fees are awarded in interpleaders "to compensate a totally disinterested

stakeholder who had been, by reason of the possession of the fund, subjected to conflicting claims through no fault of its own." <u>Am. Gen. Life Ins. Co. v. Churchill</u>, No. CV-06-61-B-W, 2006 WL 2948086, at *1 (D. Me. Oct. 16, 2006). The test for awarding fees and costs is an equitable one similar to the standard used to determine whether interpleader relief ought to be granted – the stakeholder should be made whole if required to assume the risk of multiplicity of actions and erroneous election. <u>Sampson</u>, 556 F.3d at 8.

Notwithstanding the general rule favoring attorney's fees in interpleaders, courts more closely scrutinize an insurer's requests for fees and costs based on three rationales. First, insurers should not be compensated merely because conflicting claims to proceeds have arisen during the ordinary course of their business. Underlying this rationale is the precept that insurers are uniquely positioned to allocate the ordinary costs of doing business among their policyholders. <u>Churchill</u>, 2006 WL 2948086, at *2; <u>see also</u> <u>Campbell v. N. Am. Co. for Life & Health Ins.</u>, No. 3:04-cv-1118-J-TEM, 2007 WL 2209249, at *7 (M.D. Fla. July 30, 2007). Second, insurers "are by definition interested stakeholders, because the interpleader action immunizes the company from further liability under the contested policy." <u>Churchill</u>, 2006 WL 2948086, at *2; <u>see also</u> <u>Sampson</u>, 556 F.3d at 8-9 (award of fees not appropriate when the interpleader not disinterested, but benefits from the litigation – for example, when the "great bulk" of a party's efforts are devoted to addressing a counterclaim). Third, such an award would "senselessly deplete the fund that is the subject of preservation through interpleader." <u>Churchill</u>, 2006 WL 2948086, at *2.

Employing the rationale set forth in <u>Churchill</u>, I find that New York Life's interpleader is a routine action that should not result in a fee or cost award. New York Life is capable of allocating the costs for filing interpleaders amongst its policyholders. <u>Churchill</u>, 2006 WL

2948086, at *2.  Additionally, a significant portion of New York Life's motion practice has been

defending against Ms. Ortiz's counterclaims.  See Sampson, 556 F.3d at 8-9.  Under these

circumstances, I recommend that the proper exercise of discretion is to deny New York Life's

request in Count II of the interpleader complaint for attorney's fees and costs.  Minn. Mut. Life

Ins. Co. v. Gustafson, 415 F. Supp. 615, 618 (N.D. Ill. 1976) (chief beneficiary of an interpleader

action is the insurance company and therefore not entitled to fees).

### D.  Injunction From Bringing Another Suit

New York Life requests that this Court enjoin Ms. Ortiz and Ms. Klah from initiating any

other action against New York Life related to the death benefit.  Although such claims would

likely be barred by issue preclusion or *res judicata* once this case proceeds to judgment, New

York Life is entitled to injunctive relief given its status as a disinterested interpleader and the fact

that this case is ongoing so that, at present, nothing currently prevents Ms. Ortiz or Ms. Klah

from filing another suit.  See Texas v. Florida, 306 U.S. 398, 412 (1939); New York Life Ins. Co.

v. Deshotel, 142 F.3d 873, 879 (5th Cir. 1998).  Accordingly, I recommend that the Court issue

the injunction under 28 U.S.C. § 1335 to prevent them from initiating any other action against

New York Life in any state or federal court concerning the death benefit.  See 28 U.S.C. § 2361;

4 Moore's Fed. Prac. § 22.04[5] (2014).

## IV.  CONCLUSION

For the foregoing reasons, I recommend that New York Life's Motion for Interpleader

Relief (ECF No. 14) be granted in part and denied in part as follows.  The motion should be

granted in that New York Life should be granted interpleader relief as requested in Count I of its

complaint; it should be directed to deposit the sum of $250,000, plus 9% interest, into the

Registry of the Court[13] within thirty days following the Court's acceptance of this report and recommendation; upon deposit of the death benefit plus interest, it should be dismissed and excused from further proceedings in this case and be deemed to have fully performed and complied with its obligations under the policy arising from the death of Mr. Kaydea; and Defendants (Ms. Ortiz and Ms. Klah) should be enjoined from instituting or maintaining any other action in this or any other forum relating to the death benefit at issue in this case. The motion should be denied to the extent that it sought a ruling that the rate applicable to the calculation of interest should be 1% and that New York Life should be awarded its attorney's fees and costs.

I further recommend that New York Life's Motion for Summary Judgment (ECF No. 16) be granted in that all of Ms. Ortiz's counterclaims should be dismissed with prejudice.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
October 20, 2014

---

[13] At the hearing, Defendants inquired about depositing the funds into an interest-bearing account. They are directed to DRI LR Cv 67, which allows them to specify in the order the name and address of a local financial institution into which the funds are to be deposited and the type of account desired, provided that any order that directs the Clerk to invest in an interest-bearing account or investment fund must also direct the Clerk pursuant to 28 U.S.C. § 1914(b) to deduct a fee in accordance with the schedule set by the Judicial Conference of the United States.