```
 1              THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF RHODE ISLAND

 3

 4
     NEW YORK LIFE              CA NO. 14-74 S
 5   INSURANCE COMPANY

 6       Plaintiff

 7

 8
          vs                   PROVIDENCE, RI
 9
                               AUGUST 1, 2014
10

11   MASSIEL ORTIZ
     JULIA KLAH
12
         Defendant
13

14
       BEFORE:  MAGISTRATE JUDGE PATRICIA A. SULLIVAN
15

16

17   APPEARANCES:

18   FOR THE PLAINTIFF:        BROOKS R. MAGRATTEN, ESQ.
                               Pierce Atwood LLP
19                             72 Pine Street
                               5th Floor
20                             Providence, RI 02903
                               401-588-5113
21
     FOR THE DEFENDANT:        STEPHEN A. RODIO, ESQ.
22                             MICHELLE FELIX, ATTY.
                               Rodio & Brown
23                             2139 Broad Street
                               Cranston, RI 02905
24                             401-274-4040

25
```

1    AUGUST 1, 2014

2         THE COURT:  Good morning, everyone.  We are here

3    in the matter of New York Life Insurance vs Massiel

4    Ortiz and Julia Klah.  This is Civil Action 14-74 S, and

5    we are here this morning to hear argument on two

6    motions.  First we have plaintiff's motion for

7    interpleader relief, which is ECF 14, and second

8    plaintiff's motion for summary judgment directed towards

9    defendant Massiel Ortiz's counterclaim.  That is ECF

10   number 16.  Before we begin, would counsel enter your

11   appearances, please, for the record?

12        MR. MAGRATTEN:  Brooks Magratten for the

13   plaintiff New York Life.

14        MR. RODIO:  Stephen Rodio for Ms. Ortiz.

15        MS. FELIX:  Michelle Felix for Ms. Ortiz.

16        THE COURT:  All right.  All right, Mr. Magratten,

17   you are the plaintiff and the movant so I'll hear from

18   you first.

19        MR. MAGRATTEN:  Good morning, your Honor.

20        THE COURT:  Good morning.

21        MR. MAGRATTEN:  You know the circumstances behind

22   the case are tragic indeed.  It involves the death of a

23   22 year old young man who apparently was an accomplished

24   musician in March of 2013, his body was discovered on

25   fire in a Cranston cemetery, and approximately four

1   months before then he had purchased a $450,000 life

2   insurance policy with New York Life.  Following his

3   death, local authorities contacted New York Life about

4   the policy.  New York Life was subpoenaed by the

5   authorities, turned over documents related to the

6   policy, and what followed then, I think about a month

7   later, was a claim received by the primary beneficiary,

8   Ms. Ortiz, and what followed then are really two

9   investigations.  One into Mr. Kaydea's death by -- and

10   it appears that both the Cranston Police and Rhode

11   Island Attorney General personnel were involved in that

12   investigation.  Second, because death arose within the

13   contestability period under the policy New York Life

14   did, as it normally does in those circumstances, begin a

15   contestability investigation in which it requested

16   medical records, pharmacy records, criminal records, to

17   investigate the representations in the application.

18        THE COURT:  One question on that point,

19   Mr. Magratten, my observation is that the only, of all

20   the facts that have been presented by all the parties,

21   the only dispute is whether the contestability

22   investigation was routine and the defendant Ortiz has

23   presented record references suggesting that the

24   investigation became -- I can't remember the term that

25   it went from standard to extreme, non-standard.

1        MR. MAGRATTEN:  Correct.

2        THE COURT:  But as I read the underlying facts,

3   and I don't know if we can sort of kind of reach the

4   point where this fact is undisputed, and obviously I'm

5   going to hear from Ms. Ortiz's counsel on this, but it

6   seemed as if it was a routine contestability

7   investigation.  That is the initial letter seems to be a

8   very routine letter, but as the contestability

9   investigation proceeded it became different from routine

10  because of the unusual circumstances.

11       MR. MAGRATTEN:  I think that's a fair

12  characterization.  I asked my client the same question

13  that Mr. Rodio has raised, we're dealing here with death

14  by strangulation, what does medical history have to do

15  with this, and we're in a state where in order to

16  rescind coverage you have to show that the

17  misrepresentation was related in some fashion to the

18  cause of death.  That's not the case in every state, and

19  what I've been informed by New York Life is when death

20  does occur within a contestability period the standard

21  operating procedure go out and start looking for these

22  records.  What became of interest particularly in the

23  circumstances of this case was a suggestion by

24  authorities that this death was gang related, and there

25  is a question in the application requiring the applicant

1   to respond as to whether, in this case, he has been

2   convicted of a crime, pled guilty of a crime, or whether

3   there were any criminal charges then pending.  Now for

4   that reason they, New York Life requested, or tried to

5   get criminal records from Providence Police and from

6   Cranston Police pertaining to Mr. Kaydea.  They were

7   ultimately unsuccessful in getting all those records

8   except they were informed by Cranston Police that Mr.

9   Kaydea did have an arrest record.  And it's not -- I

10   think it would be an overstatement to say that medical

11   records in this case would be completely irrelevant.

12   And let's take the case, for example, that there are

13   medical records out there which indicate that Mr. Kaydea

14   has had a history of stab wounds, gunshot wounds, other

15   physical conditions that might point to gang

16   involvement, or criminal involvement.  I have absolutely

17   no basis in fact that to know that that is the case.

18   I'm just spinning a hypothetical here as to why --

19       THE COURT:  Right.  But at the outset of the

20   investigation New York Life doesn't know what we know

21   now and therefore -- and would it be correct that the

22   letter that New York Life first sent, I think it was

23   May 2nd, and the array of records that were reflected in

24   that letter, are what would be done in any instance

25   where the death occurs within the contestability period

1 as the first thing that happens.

2   MR. MAGRATTEN:  Yes, yes, that's very much --

3   THE COURT:  So to that extent it's routine.

4   MR. MAGRATTEN:  Standard operating procedure.  I

5 think the thrust of Ms. Ortiz objections to this motion

6 seems -- she raises the defense of laches and she's

7 concerned about the time lapse.  And again I come back

8 to what was going on during the period.  New York Life

9 made the request for medical records.  There was

10 difficulty on Ms. Ortiz's part responding because she

11 had no legal relationship with the decedent.  She was a

12 girlfriend for a period of time and the mother of the

13 child born out of that relationship but she engaged a

14 law firm in Rhode Island different than the one

15 currently engaged to help get the records.  They were

16 unable to provide the records, and this process went on

17 all the way up through the fall towards the end of 2013,

18 and during the same time New York Life was checking in

19 routinely with authorities.  Very significantly, I

20 believe it was May or June of 2013, the authorities

21 informed New York Life that in this case the family and

22 the beneficiary are persons of interest in the

23 investigation.

24  So going forward, New York Life's investigator would

25 contact authorities every month, every two months, all

1    the way up through, I believe, early January 2014 to

2    find out about the status of the investigation.  They

3    were always told the investigation was still ongoing.

4    They were told it was very active.  And no one can be

5    ruled out.

6            THE COURT:  Was Ms. Ortiz, or her counsel, put on

7    notice that part of the thrust of the contestability

8    investigation was a slayer statute problem?  Was she

9    ever informed of that?  And if not, is there a reason to

10   explain it?  I'm not sure it's material but it's

11   certainly something that the defendant has raised.

12           MR. MAGRATTEN:  I'm not aware of any written

13   communication made to -- I mean, from the file I have, I

14   have not seen any written communication to Ms. Ortiz

15   that addresses the slayer statute problem, although I

16   would argue whenever you have an investigation and the

17   beneficiary has been identified as a person of interest,

18   it can't be ruled out.  That's always a concern on the

19   part of the insurer.  So I think further, the second

20   half of 2013 there were these two things going on.

21   Number 1, they're still trying to get the medical

22   records which were proving to be extremely difficult to

23   obtain, and at the end of 2013, the beginning of 2014

24   New York Life essentially says okay, we've tried to get

25   medical records, we can't get medical records, we're not

1    going to get any more criminal records, we've done --

2    we've followed this investigation to the end of its rope

3    and we have no basis to rescind the policy, so we

4    determined that benefits are now payable.  The further

5    complication at this point was clearly we have a claim

6    by the primary beneficiary to the policy proceeds.  The

7    primary beneficiary has been identified as a person of

8    interest.  He cannot be ruled out in the investigation

9    of

10   Mr. Kaydea's death.  But further there was a telephone

11   conversation between the New York Life's sales agent,

12   the agent who sold this policy, and the secondary

13   beneficiary, Ms. Klah, who I understand is a resident of

14   Pennsylvania.  Ms. Klah at that time, according to the

15   sales agent, the telephone conversation, Ms. Klah was

16   very angry.  She was distressed, naturally, that her son

17   had died.  She was further distressed to learn that a

18   life insurance policy had been taken on his life months

19   before his death.  She was in further distress to learn

20   that the primary beneficiary was Ms. Ortiz who Ms. Klah

21   did not particularly care for.  Ms. Klah told the New

22   York Life sales agent that she was then speaking to the

23   FBI about the matter, and she did not want to see

24   insurance proceeds paid to anyone.  That was the

25   substance of that conversation.

1        Following that point, New York Life was aware

2   certainly of the possibility of competing claims to the

3   benefit, and then Ms. Klah proceeded to retain counsel

4   in Rhode Island, Mr. Corley, who has not filed an

5   objection to this motion, to these motions.  Mr. Corley,

6   in turn, hired an investigator who's been looking into

7   the matter and in response to the interpleader complaint

8   Ms. Klah in fact did file a cross-claim which remains

9   pending by claiming an interest in the death benefits.

10  I think your Honor will probably recall from the Rule 16

11  conference we had in the matter there was some

12  discussion between beneficiaries trying to reach an

13  agreement to set aside some funds for the minor child,

14  but, apparently those have not progressed any further.

15  So on this basis, New York Life is doing -- trying to

16  accomplish two things:  One, leave to permit to deposit

17  the funds in the registry of the court, net of

18  attorney's fee claim of approximately $12,000.  In

19  response to the --

20          THE COURT:  Plus whatever interest might be.

21          MR. MAGRATTEN:  Yes, and that's a separate issue.

22          THE COURT:  Right.

23          MR. MAGRATTEN:  That's been briefed and the Court

24  needs to address.  In response to the complaint, New

25  York Life received from Ms. Ortiz a counterclaim of

1  consisting of seven counts, breach of contract,

2  negligence, breach of the duty of good faith and fair

3  dealing, trade practices claim, bad faith.  I'm not sure

4  I've named them all but essentially New York Life's

5  position is, that still to their essence, the essential

6  claim of each of these counterclaims is you should have

7  paid me the money alone right away.  Your failure to do

8  that has caused me harm.  New York Life has cited the

9  Hovis case out of the Third Circuit which discusses the

10  fact that counterclaim relief of that nature is

11  inconsistent with the basic principles of interpleader

12  relief.  When an insurer is faced with competing claims

13  or other impediments to paying a benefit it should be

14  allowed to seek interpleader relief and have the Court

15  resolve the issue of who is entitled to funds

16  particularly in a case like this where unfortunately the

17  facts give rise to many issues that need to be

18  addressed.  So New York Life would ask that the

19  counterclaims be dismissed as a matter of law.

20      THE COURT:  Let me stop you on the Hovis case

21  because it's interesting and it certainly -- I mean it

22  appears to be the policy goal that if during the period

23  of contestability the insurance company does a routine

24  investigation, routine being look at all the things that

25  might lead to either the voiding of the policy or some

1    question as to where the policy goes, and then within a

2    reasonable amount of time files an interpleader action

3    as a matter of law counterclaimed by the people who are

4    sued in the interpleader go away without further

5    inquiry.  Here is my concern, and it looks like your

6    arguing -- you've kind of got two arguments that the

7    counterclaim goes away.  One is sort of a Hovis

8    principle as a matter of law, go no further; and then

9    second, your summary judgment motion says now let's go

10   into the facts, the undisputed facts which appear to be

11   almost entirely undisputed and decide whether or not

12   there is a claim here.  And I think your argument is we

13   can stop at level 1 and get rid of this counterclaim.

14   If we have to go on to level 2, it goes away anyway.  So

15   here's my question, does Hovis have any outside limits?

16   That is, is the doctrine that's set by Hovis, you know,

17   is there some equitable principle that says that

18   nevertheless -- I mean, in this instance there's clearly

19   -- when you move to the summary judgment standard, I

20   think New York Life has some very good arguments that

21   I'm going to want to hear from Mr. Rodio on as to why

22   its conduct in this instance is reasonable throughout

23   and has enough indicia of good faith and there's no

24   countervailing evidence contrary that you grant summary

25   judgment.  But focusing on that first principle, what

1   are the limits of it?  So that if the insurance company

2   really is overtly behaving in bad faith yet you have a

3   death within contestability and then a filing of an

4   interpleader, are those two facts the only facts we need

5   to say okay, all counterclaims are gone?

6           MR. MAGRATTEN:  I think I understand where you're

7   going in this.

8           THE COURT:  I hope.  Yeah.

9           MR. MAGRATTEN:  And let's take an extreme case.

10  Let's take the case where a life insurer receives a

11  claim.  There are issues to be investigated, life

12  insurer determines in year 1 that, yes the benefit is

13  payable but we just can't figure out to whom it should

14  be payable.  We should file an interpleader, and then

15  they wait for five years because, hey, we're getting a

16  6% investment rate of return on this money and we only

17  have to pay out a 1% rate of return so let's just sit on

18  this.  And the beneficiaries are screaming and lawyers

19  are writing nasty letters and all sorts of things are

20  happening.  I think Hovis and the cases that we cite

21  with Hovis recognize that there may well be -- I mean,

22  this whole concept of interpleader is an equitable

23  remedy, and subject to equitable defenses of laches and

24  other equitable defenses, and clearly Ms. Ortiz has

25  seized upon that in her brief, she's raising laches.  I

think the Court can determine this as a matter of law because the Court and all parties now have the claim file, and the claim file shows that as towards the very end of 2013 when New York Life, despite all of its efforts, realized we're just not going to get these medical records. They're not available. And we're not going to get any more information from Cranston Police about Mr. Kaydea's criminal history. And the only thing authorities are telling us is that it's an active investigation. So we're stuck. It's at that point, frankly, New York Life contacted me and said, okay, we need to deposit these funds and we filed the complaint, I believe it was in January perhaps early February of 2014 we started this process. I think the Court can determine this from those undisputed facts whether as a matter of law there's laches here or not. I should think the legal answer to your question is the remedies discussed in Hovis are subject to equitable defenses which is laches.

        THE COURT: Okay. I'd like -- I find the insurance rate confusing.

        MR. MAGRATTEN: The interest rate?

        THE COURT: Yeah. I'm sorry, yeah, interest rate.

        MR. MAGRATTEN: So do I.

1    THE COURT:  So I would really like to hear a

2  little bit on that.

3    MR. MAGRATTEN:  Candidly, you know, I've been

4  doing this work for years and this is the first time

5  I've heard of this, but --

6    THE COURT:  Yeah, I was struck by the lack of

7  case citations, the cases clarifying how to figure this

8  out.

9    MR. MAGRATTEN:  And it's not because I didn't

10  look.  I think as the Court is well aware, for an

11  insurer to sell a policy in a state like Rhode Island,

12  the form has to be approved and blessed by the insurance

13  department of DBR and any changes to the form has to be

14  reviewed and blessed by DBR, and this presents practical

15  issues to an insurer like New York Life is trying to

16  sell life insurance in fifty different states.  The

17  process of getting approvals is laborious and is very

18  difficult.  So apparently stemming from that difficulty

19  that the industry recognized is an interstate compact to

20  which Rhode Island has subscribed, and the compact

21  basically, as I understand it, the interstate compact

22  has a committee or a board made up of state regulators

23  from a variety of states and they will review policy

24  forms, and once reviewed and approved by this interstate

25  compact those forms can be sold in all the states that

1    subscribe to the compact.  It's meant to be an easier

2    way for insurers to access these markets without having

3    to deal with multiple regulators.  Rhode Island is a

4    subscriber.  This policy sold was based on language that

5    has been approved by the interstate compact.  That's on

6    the last page of the policy.  There is a statutory

7    provision in Rhode Island laws that basically says that

8    the interstate compact will be the final arbiter of the

9    content.  There's a typo and I realize that it

10    originated with my brief and then it was picked up in

11    Ms. Ortiz's brief, not context, content.  And to the

12    extent there was a conflict under state law, it's the

13    content of the approved policy form that governs.  So

14    here we have the policy form says that the prevailing

15    interest rate shall be set by the insurer depending on

16    the time of death, New York Life, the interest rate that

17    applied at the time of Mr. Kaydea's death was 1%.

18    There's a further provision for additional interest

19    under certain circumstances.  We would contend do not

20    apply here.  And you're right, unfortunately I did look

21    for case law that talks about this intersection between

22    the interstate compact and conflicting state law.

23         THE COURT:  Yeah.  So if I understand it right,

24    Rhode Island has a, assuming the scheme is as you've

25    described it, I have no reason to think that it might

1    not be, Rhode Island has a default rate in its statute

2    of 9% but that your argument is that if the insurer puts

3    a different insurance rate into its policy, and that

4    policy has been approved under the compact, then Rhode

5    Island law says our default rate doesn't apply, instead

6    the policy rate applies, which in this instance the

7    policy simply gives the discretion to New York Life, and

8    New York Life's rate is consistent with treasury rates

9    at the time and not 9%.

10           MR. MAGRATTEN:  Correct.

11           THE COURT:  So it's a substantial difference.

12           MR. MAGRATTEN:  The language basically comes from

13   an approved form by the interstate compact which was the

14   internet reference in my brief.  If you go there and

15   look, you'll see the policy form which is what they're

16   using.  This is not language that New York Life invented

17   this is the language from the interstate compact.

18           THE COURT:  So the function of the statutory 9%

19   is simply to provide for a default in a situation where

20   the policy is silent.

21           MR. MAGRATTEN:  If the New York Life policy did

22   not address post-mortem interest at all, I think

23   Ms. Ortiz's argument would be correct that the state

24   statute supplies the law in that circumstance.  But

25   here, I mean the Rhode Island statute addresses

1    specifically what happens when you have a conflict

2    between the terms of the policy and other Rhode Island

3    state law and it provides that the terms of the policy

4    prevail.

5          THE COURT:  I'd also like to hear from you

6    briefly on attorney's fees in a situation like this.

7    The defendant has argued, and I haven't gone deeply

8    enough to have a sense, but sort of has an appealing

9    feel to it that an insurer doesn't get attorney's fees

10   for its sort of normal course of business and that a

11   contestability investigation described by you as

12   undisputedly in this instance, at least at commencement

13   routine, would fall into that category of an insurance

14   company doing its business and that it's not appropriate

15   for the Court to exercise its discretion to pay the cost

16   that the insurance company already builds into the

17   premium.

18         MR. MAGRATTEN:  Correct.  I mean there is a split

19   of authority on this.  The old rule, and still the

20   prevailing rule in most jurisdictions, is in an

21   interpleader case, particularly where the stakeholder

22   itself has done nothing to cause the dispute that brings

23   everyone to court, the stakeholder should be allowed to

24   recover reasonable attorney's fees.  There are some

25   decisions, this is a minority view, and it mostly comes

```
 1    out of the west coast jurisdictions, that, Hey this is a

 2    cost of doing business for the life insurer.  A certain

 3    number of these claims are going to result in an

 4    interpleader practice, so the insurer should foot the

 5    bill.  And there are competing policy arguments here.  I

 6    mean not all interpleaders involve life insurance

 7    companies.  I think the general concept is the

 8    stakeholder comes to court through no fault of its own.

 9    There's no one suggesting here that New York Life had

10    anything to do with Mr. Kaydea's demise or the reasons

11    why he designated beneficiaries the way he did or the

12    reasons why Cranston authorities or Rhode Island

13    Attorney General's office cannot move along quicker in

14    its investigations, and for those reasons it's unfair to

15    tax New York Life with basically my fees for having to

16    come to court to ask for leave to deposit the policy

17    benefit.  But there is a countervailing policy view --

18         THE COURT:  Is there any law addressing the issue

19    in the circuit, in our circuit?

20         MR. MAGRATTEN:  I think in our motion we do cite

21    several First Circuit cases.

22         THE COURT:  Okay.

23         MR. MAGRATTEN:  There's certainly First Circuit

24    precedent for awarding attorney's fees in --

25         THE COURT:  If it's in your brief, I'll find it.
```

1      MR. MAGRATTEN:  I believe it is.  But we cite the
2   Sun Life Insurance case which is First Circuit 2009
3   affirming an award of about $8,600 in attorney's fees,
4   an interpleader case involving 48,000 in insurance
5   proceeds.  There's a Smith Barney Harris case, District
6   of Mass, 1994, and Foxboro Savings Bank case, District
7   of Massachusetts, 1999.  Yeah, there is authority within
8   the First Circuit for (inaudible).  And the other,
9   you'll see in the order that we propose, part of
10  interpleader relief is that New York Life would be
11  deemed upon depositing the funds with the registry of
12  the court, New York Life would be deemed to have fully
13  performed its obligation under the policy, the remaining
14  parties would be enjoined from prosecuting any claim to
15  those fees anywhere outside of this legal action, so the
16  idea is once New York Life has deposited the money it is
17  dismissed from the action, and the parties can, of
18  course, subpoena information from New York Life if they
19  need additional documents or need to depose anybody but
20  there's no need really for New York Life to remain in
21  the case for that.
22      THE COURT:  All right, good.  Thank you,
23  Mr. Magratten.
24      MR. MAGRATTEN:  One footnote --
25      THE COURT:  Oh, sorry.

```
 1          MR. MAGRATTEN:  I'm sorry, one footnote I need to

 2   add.

 3          THE COURT:  Yes.

 4          MR. MAGRATTEN:  I was on the phone this morning

 5   with Clare Parvin, the financial officer for the Court,

 6   and according to Claire the funds can be deposited in

 7   one of two ways.  The easy way is to just cash deposit

 8   into the registry of the court, non interest accruing

 9   account, and the order we've prepared would allow just

10   that.  If the parties want the funds deposited into an

11   interest bearing account, that under local rules

12   requires special language in the order and Claire sent

13   out a warning that if that's the road the parties want

14   to go down to the prevailing interest rates right now

15   are very low and there's a fee that goes to setting up

16   that kind of account.  So economically it may not make

17   good sense to go down that road.

18          THE COURT:  All right, good.  Thank you.  All

19   right, Mr. Rodio, Ms. Felix.

20          MR. RODIO:  Good morning, your Honor.

21          THE COURT:  Good morning.

22          MR. RODIO:  Before I begin I want to thank the

23   Court for accommodating our CLE schedule last week and

24   rescheduling this hearing.  I'm not sure we're any

25   smarter but we do have six or eight for credits.
```

1          THE COURT:  Thank God for that.  Everybody is

2   good to go for another year.

3          MR. RODIO:  Your Honor asked a question about the

4   equitable nature of interpleader and we've cited a case,

5   we just dug it out, back from 1957 but it's still a good

6   case out of the District Court in New York, American

7   Wine Steamship Company vs Bowering & Company, and there

8   the Court notes very clearly that it's well established

9   that the remedy of interpleader is equitable in nature

10  and is governed by equitable principles.  And the

11  federal interpleader act did not do anything to change

12  the equitable nature of an interpleader action.

13      I think, given that, and I think, and maybe I'll

14  regret saying this but it really seems like a rather

15  straight forward and almost intuitive legal analysis

16  when you're discussing interpleader, and particularly

17  when you put it in the nature of an equitable

18  proceeding.  You have an innocent stakeholder who

19  through no fault of their own finds themselves with two

20  legitimate competing claims to a fund.  They've do not

21  claim any interest in that fund, and they should not be

22  penalized by choosing one or the other.

23      In order to make those determinations, though, one

24  needs to bore down into the facts of the case in order

25  to determine, one, whether this is a completely innocent

1    stakeholder one needs to bore down into the facts, and

2    Mr. Magratten to his credit makes a very nice

3    superficial argument, I think, oh, we investigation and

4    contestability period and health records, et cetera, et

5    cetera, but what I'd like to do is bore down into those

6    issues a little bit and let's see how reasonable New

7    York Life's actions have been.

8             THE COURT:  And, Mr. Rodio, let me just sort of

9    stop you there and give you my concern about your

10   argument, and that is that if the doctrine of laches

11   tells an insurance company that they've got to make a

12   decision and pay in a situation where there is an

13   ongoing murder investigation, in effect the Court would

14   be saying that equitable principles require that the

15   clever murderer be paid because the clever murderer has

16   covered up the tracks well enough that the investigation

17   takes longer than the legal laches pressure on the

18   insurer to just make a payment.

19            MR. RODIO:  Sure.

20            THE COURT:  It doesn't seem to me that's

21   consistent with equity.

22            MR. RODIO:  And I completely understand that

23   question, and I struggled with it myself, and the

24   conclusion I've come to is we don't need to answer that

25   in this case because it has been 16 months, your Honor.

1    This didn't happen a month ago or two months ago or six

2    months ago.  That's the first answer to that.  There is

3    some period of time when an unsolved murder does not

4    allow an insurance company to hold on to a quarter of a

5    million dollars that doesn't belong to it.  What that

6    precise amount of time is, I don't know and I'm glad I

7    don't have to answer it in that case, but I think

8    16 months is fair enough.

9         THE COURT:  And I want to throw out the facts

10   that have grabbed me as I've looked at the papers, and I

11   must say I've looked at things what I would call very

12   superficially.  I've been through, I think, all of your

13   papers.  I've looked at some of the cases but I may have

14   missed things, I may have focused on the wrong things,

15   so that's why I want you to know what I'm thinking.  A

16   couple of things that really strike me, first of all,

17   the period isn't the 16 months, it's really just right

18   up until the interpleader, and the interpleader is

19   initiated less than a year after the murder, if I've got

20   it right.

21   The second thing is that the police tell the

22   insurance company that your client is a person of

23   interest right out of the box, according to my notes

24   within a week of the receipt of the claim by your

25   client.  I think somewhere in the file the police said

1  to New York Life, tell us if you're going to pay that

2  beneficiary these proceeds, that's got to send a red

3  flag up flying, then not very much time passes, it's

4  like basically we get through the summer and now they've

5  got the decedent's mom in the mix talking about don't

6  pay her, and then in September 6th, so we're still in a

7  pretty short timeline from the date of death, less than

8  six months, the police tell New York Life that they're

9  really hopeful that the investigation is going to close

10  in on somebody, and possibly even in as little as a

11  month.  So for the insurance company to kind of hang

12  tight for another, I think, three months until the

13  insurance company hears from you, we're, you know, times

14  up, we're going to start to really put you under

15  pressure, and the insurance company looks at everything

16  on the radar screen that they've been able to get, and

17  all the things they haven't been able to get, and kind

18  of bottom lines it, I'm struggling to see any laches in

19  there.

20       MR. RODIO:  On a pure laches analysis, I think

21  that's a fair summary, your Honor, with one, I think,

22  very significant exception, the police never mentioned

23  my client as a person of interest.  The police said --

24       THE COURT:  Well they said beneficiary.

25       MR. RODIO:  -- family and beneficiaries --

1          THE COURT:  But she's the beneficiary.

2          MR. RODIO:  -- have not been ruled out which --

3          THE COURT:  Right.

4          MR. RODIO:  -- I mean, what does one expect, them

5    to say, your Honor?  If Mr. Corley were here I think

6    he'd tell us he would have a field day if the police

7    started ruling people out before somebody was charged

8    and then later went back and changed their minds.  I

9    think police procedure, and I'm certainly not, you know,

10   I spent a little time in the Attorney General's office

11   but that was long ago, but police procedure from a

12   common sense point of view is that you don't rule

13   anybody out unless and until somebody's been charged

14   with a crime.  So the fact that my client wasn't ruled

15   out, the fact that other family members weren't ruled

16   out, it doesn't strike me as being all that significant.

17   Of course they weren't ruled out unless and until they

18   have specific leads.  Not even specific leads.  Unless

19   and until they've charged somebody with a crime.  Could

20   you imagine if the police went on record and said, oh,

21   we're ruling out this person or that person, and then

22   they later change their mind, somebody like Mr. Corley

23   would just have a field day with that.  It's almost per

24   se reasonable doubt.

25          THE COURT:  Well, no question.  But if I look at

1    what New York Life knew within, as its early stages of

2    its investigation are proceeding, it's just hard to call

3    it unreasonable at a level that, you know, kind of

4    starts to trigger bad faith because the insurance

5    company, first of all, is aware from your client tells

6    them that she wasn't on speaking terms with the decedent

7    at the time of his death, insurance policies with death

8    within contestability just raise red flags all over the

9    place, and then you've got a murder, and then you've got

10   somebody who supposedly has an insurable interest

11   according to the policy application, not on speaking

12   terms and unable to procure medical records for a person

13   with whom she supposedly had an insurable interest.  I

14   mean, right there, and the police say the beneficiary of

15   the policy is a person of interest?  How does that not

16   put the insurance company into the precise quandary that

17   is the paradynamic interpleader situation which you

18   began at the outset by saying, of course, in that

19   situation there's no issue.

20        MR. RODIO:  Understood, and that's why I concede

21   that as a matter of a pure laches analysis I think the

22   insurance company has a good argument.  I think they

23   waited too long even under a pure laches analysis.  I

24   think once that statement was made to them they say,

25   okay, these are not our funds.  This could be a slayer.

1    And I'll get to that in a moment because --

2        THE COURT:  Yes, but at what point -- is your

3    argument that they should have initiated the

4    interpleader earlier?

5        MR. RODIO:  That's one of my arguments.  My other

6    argument is --

7        THE COURT:  Tell me when.

8        MR. RODIO:  -- they should not have strung my

9    client along with lies for close to a year.

10       THE COURT:  This is the medical record issue.

11       MR. RODIO:  This is the whole issue of --

12       THE COURT:  Let's focus on the first thing --

13       MR. RODIO:  Okay.

14       THE COURT:  -- which is when do you contend did

15   the delay in bringing the interpleader move into the

16   laches zone?  When should they have filed it?

17       MR. RODIO:  It's hard to separate the laches out

18   from the other of bad faith or inequitable conduct.  But

19   assuming there was no other inequitable conduct,

20   assuming they weren't telling her one thing and doing

21   another, it would seem to me that three months for an

22   unsolved murder is long enough for an insurance company

23   to say we don't know what to do in this instance.  And

24   we looked for cases, your Honor, on this and there are

25   none.

```
 1          THE COURT:  Yeah, that's what I was going to say,
 2   are there any cases that say how long you float with an
 3   unsolved murder before you have to do something?
 4          MR. RODIO:  I'm not the best researcher in the
 5   world but we couldn't find anything.  But, yeah, and
 6   that is the issue, I suppose.  I would make this
 7   argument, though, under the Rhode Island statute a
 8   slayer is someone who is responsible for the wrongful
 9   death of another.  I don't think it's up to the
10   insurance company to make a determination of what would
11   happen in the future, and I think if the insurance
12   company paid the proceeds out after a reasonable period
13   of time, and I'll suggest three months, to someone who
14   it was later found out was the slayer, I think the
15   insurance company is protected.  I don't think the
16   insurance company is --
17          THE COURT:  I don't know.
18          MR. RODIO:  I don't think the insurance company
19   is bound by hindsight.  I think the insurance company --
20   but be that as it may, after three months we don't know
21   who the killer is.  We don't claim any interest in these
22   funds.  We're giving our beneficiary, our insured's
23   beneficiary, a straight story which didn't happen here.
24   Let's just put these funds into interpleader.  The facts
25   of this case are almost the polar opposite of that.
```

```
1   Number 1, oh, it's a contestability period, and your

2   Honor's mentioned that a lot, and it really -- I don't

3   think co-inflates with this issue of the slayer statute

4   at all.  Whether Mr. Kaydea was murdered, when he was or

5   whether he was murdered ten years after that policy went

6   into effect --

7           THE COURT:  Slayer is going to apply no matter

8   what.

9           MR. RODIO:  The slayer is going to apply whether

10  we're in the contestability period or not.  So those two

11  things really are separate in my mind.  They used the

12  contestability period to essentially put her off, hold

13  off, hold off, give us this -- and we showed you in the

14  papers ten separate requests for medical records.  We

15  showed the Court in the papers an affirmative

16  representation "you're the sole beneficiary".  The only

17  thing that's missing are the medical records, so go get

18  the medical records.  So what does this poor girl do?

19  She hires a lawyer who for reasons I can't fathom, tries

20  to open a probate estate for the decedent, is

21  spectacularly unsuccessful, at some expense, some great

22  expense to her considering her means.

23          THE COURT:  Yeah.  Let me stop there.  You're

24  actually right that the interpleader based on the slayer

25  statute isn't linked to the contestability period.  What
```

```
1    the contestability period allows the insurance company
2    to do is to search for suggestions of reasons why the
3    policy is void.
4         MR. RODIO:  Exactly.
5         THE COURT:  And it seems to me, and Mr. Magratten
6    has suggested a couple of hypotheticals, and I can think
7    of about 50 more, that there are lots of reasons why
8    someone whose death certificate says, you know, murder,
9    might nevertheless present a policy that's void and that
10   the kind of documentation that the insurance company is
11   looking for are not just standard in every
12   contestability investigation but also are the kinds of
13   documents that might very well expose either a health
14   issue or something that's revealed to a caretaker, a
15   medical caretaker, and that's reflected in notes, that
16   demonstrates some voidability issue that is what is the
17   focus of the insurance company, and for whatever reason
18   the insurance company got to January of 2014 and said
19   we've done enough, we're satisfied that there isn't a
20   voidability problem with this, all we've got is the
21   slayer statute, and therefore we're going to interplead
22   it.  But it just seems to me that every single time
23   there's a death in the contestability period insurance
24   companies always do an investigation that involves a
25   survey of the medical records, and at the getgo they
```

1   don't know that your client can't procure them.  They're

2   insuring -- they're assuming they've got someone with an

3   insurable interest who was identified in the policy as

4   about to become a wife, I think it said soon to be

5   spouse or something.

6         MR. RODIO:  Intended spouse.

7         THE COURT:  Yes, and so they make a routine

8   request, and she doesn't come back and say, oh, you

9   know, this is a guy I only kind of had a very short

10   relationship with and I'm not even speaking to him, and

11   I have nothing to do with him, and I'm not going to be

12   able to procure his medical records.  She didn't say

13   that, right?  So that attorney --

14         MR. RODIO:  There's no record of that.

15         THE COURT:  Yeah.

16         MR. RODIO:  I'm not exactly sure of what her

17   lawyer said but certainly the insurance company was

18   aware that she was forced to open a probate because she

19   didn't have access to those with HIPA and all that

20   now-a-days.

21         THE COURT:  But if she had been a common law wife

22   she would likely have been successful in opening.  The

23   insurance company didn't know that.  So I'm really

24   struggling to see how the request for medical records,

25   which is such a normal expected thing to do as part of

```
 1    the contestability period investigation, rises to the

 2    level of bad faith, because I think that's your

 3    argument.

 4         MR. RODIO:  I respectfully disagree with your

 5    Honor.  I don't think it is a normal and expected thing.

 6    If I buy an insurance policy today, and tomorrow I

 7    perish in a car accident, my medical records --

 8         THE COURT:  They're going to get the same letter.

 9         MR. RODIO:  -- are irrelevant.

10         THE COURT:  No.  I think the same letter that

11    went out, I think -- and I may be wrong, I'll ask

12    Mr. Magratten --

13         MR. RODIO:  Well, it could be but let's define

14    what a contestability period is.  A contestability

15    period is a period of time, in this case two years, I

16    think, where the insurance company can void the

17    insurance based upon misrepresentations in the

18    application.  That's what a contestability period is.

19         THE COURT:  Correct.

20         MR. RODIO:  It's not, oh, we found something we

21    didn't know about you or, you know, we shouldn't have

22    written this insurance for some reason.  It is -- there

23    is a misrepresentation in the application and that

24    misrepresentation is connected to your cause of death.

25         THE COURT:  Correct.
```

1      MR. RODIO:  So there's no way to analyze this

2  without looking at the application, and that's what I

3  have in front of me, your Honor.  First of all, with

4  regard to medical records, Mr. Magratten gave -- because

5  I tried to think of examples myself.  Mr. Magratten gave

6  an example, oh, suppose he'd been stabbed five times in

7  the past.  But they didn't ask that.  There's nothing in

8  this medical questionnaire --

9      THE COURT:  They ask about his criminal

10  experience.

11      MR. RODIO:  Well, I'm going to get to that, but

12  if I could just let me go through very briefly the

13  medical questions.  Do you have high blood pressure.

14  How does that relate to being murdered?  Do you have

15  sugar or diabetes?  Do you have shortness of breath?  Do

16  you have cancer, tumor, ulcer?  Do you have multiple

17  sclerosis?  Do you smoke?  Do you have a kidney

18  disorder?  No, no, no.  Do you have muscle weakness?

19  Have you been diagnosed with AIDS?  Do you have chest

20  pressure?  Have you had surgery?  Your spouses and

21  natural parents, have they suffered angina, heart

22  disorder, stroke, diabetes, cancer?  One can look at

23  this closely, and I have, and there's nothing in this

24  medical questionnaire that would relate in any way to a

25  person being murdered.  So as my starting point here is

medical records are irrelevant.  Any -- particularly
we're -- I'm an amateur at this.  Mr. Magratten is a
heck of a lot better than me.  But an insurance
professional saying I want to know if this policy is
contestable based upon medical misrepresentations, we'll
look at this and would say none of these things relate
to murder.  Let's suppose he did have shortness of
breath or chronic bronchitis, how would that relate to
his being murdered?  It wouldn't.  So I think an
insurance professional, a reasonable insurance
professional, looking at this would say medical records
are irrelevant.  We're in the contestability period,
yes, but medical records mean nothing in this case.  And
having looked at it now, I believe they mean nothing.

     Now, the only -- and just for the record, I'm
referencing page New York Life 0018 in the record,
that's the medical questionnaire, and the only other
part of the --

          THE COURT:  One question, Mr. Rodio, I'm
assuming, and it's probably in the record and I just
didn't find it yet, that the death certificate was part
of what your client provided in connection with her
claim?

          MR. RODIO:  That's right.

          THE COURT:  And that the death certificate shows

```
 1    that the cause of death was murder?
 2         MR. RODIO:  Homicide.  Strangulation by ligature
 3    is the way it's put.
 4         THE COURT:  I assumed that was in there somewhere
 5    but I hadn't found it.
 6         MR. RODIO:  So the other, and Mr. Magratten may
 7    correct me when he gets up, but the only other potential
 8    misrepresentation in the application, and the
 9    application I'll just say for the record is New York
10    Life, and they put it in first, to their credit, because
11    it is the most important thing, New York Life 001
12    through -- well, my copy is cut off, I think it's 0020.
13    That's the entire application.  The only other page that
14    I found that is even potentially relevant to a
15    contestability investigation is page 007, and that is,
16    and your Honor correctly pointed out, that's a question,
17    have you pled guilty to or been convicted of or been
18    imprisoned for any felony or misdemeanor, or are there
19    any such charges currently pending.  I concede that a
20    misrepresentation on that question could potentially
21    implicate contestability in this case.  I also know from
22    experience that one could get an answer to this
23    question, if not in 15 minutes certainly in a day.  An
24    experienced investigator can get a BCI on someone, an
25    experienced -- I can go on the computer, anyone can go
```

on the computer and see if there are pending charges against anyone.  That literally, well not literally, but I think that's a one hour investigation.  It's certainly not a one year investigation.  That's the only other portion of this application that I can find, not the only other portion, the only portion of this application that I could find that remotely could implicate contestability.  These are insurance professionals, your Honor.  They know what they're looking for.  Is there a misstatement in this policy that led to this death that essentially tricked us into insuring him, right?  That's what contestability is all about.  And I think an insurance professional looking at this would say, well, let's check whether he's been in prison for a felony or misdemeanor, or whether there's any charges currently pending, but that's the only potential investigation they needed to do here, and that certainly didn't take 12 months, or 11 and 1/2 months, however long it came for this interpleader.

     Which brings me, I guess, maybe to the summary judgment argument.  I don't think that it is fair to rule as a matter of law that this investigation -- the details of which New York Life has only given us the broadest outline of, that this investigation was reasonable and necessary and went on for a period of

time that was required in order to do that.  In fact, if I were a factfinder, we're not here to find facts, but if I were a factfinder, I think I would find exactly the opposite.  I think I would find five minutes with the medical questionnaire and a reasonable insurance professional would say that's irrelevant, and then ten minutes looking up databases for felony or misdemeanor convictions, and there's your contestability investigation it's done.

Now, the second issue in whether -- in terms of whether it's fair to find as a matter of law is can, or should, the Court find as a matter of law that an insurance company that essentially misleads a beneficiary into believing that the only reason they're not being paid their benefits are irrelevant medical records is it fair to conclude as a matter of law that that is not actionable?  I don't think it is.  I don't think it is.  I think to get back to your Honor's original question, I think if New York Life had, and there are ways to do this without offending anyone, but if New York Life had informed Ms. Ortiz that this was an unsolved murder, and that there were certain legal prohibitions to paying claims with regard to an unsolved murder, when the murderer had not been apprehended, I think that would be reasonable, and I think if that

```
 1   representation went on for two, or three, or four

 2   months, I think that would be reasonable, as well.  But

 3   I think what's unreasonable is to tell her something

 4   completely different than that.  And your Honor asked

 5   when she found out about the slayer statute, I'm not the

 6   smartest person in the world, and I don't this that

 7   often, but I can tell you the first time I found out

 8   because I was befuddled as to why they weren't paying

 9   this claim.  It's when I got, or when Mr. Magratten

10   called me and told me that he would be filing an

11   interpleader and I said what's the deal?  And he said

12   slayer statute, and that's when the lights went on in my

13   head.  So I had no idea, and I've been with this case

14   two or three or four months at that point -- well, not

15   four months, but I'd been with this case certainly a

16   sufficient period of time that maybe I should have

17   thought of that, but I had no idea.  Certainly my client

18   had no idea that the slayer statute was involved in any

19   way in this.  We're thinking medical records, and then

20   we're thinking, well now we've put their feet to the

21   fire, we've showed them that medical records are

22   irrelevant, now they're going to file an interpleader.

23   Why?  What's it all about?  So that's when slayer

24   statute comes into the picture, and that's when this

25   really tragic statement from the decedent's mother, I
```

guess, comes into the picture.  Of course we didn't know

about that, either.  And the question there is, as a

matter of law, can the Court say that a distraught

mother, and anyone who's a parent, I mean, your heart

just goes out to this woman, but can the Court say as a

matter of law that a distraught mother saying no one's

going to benefit from the death of my son, does that

create a sufficient legal issue such that interpleader

is required.  I don't think it does.  I don't think

there's any cognizable claim that the decedent's mother

has to this insurance policy unless, and it's circles

right back to the slayer statute, unless my client's a

slayer.  So the fact that the mother said this, it's

dramatic, it's heart-wrenching, but legally, I don't

think it means anything.  I don't think it means

anything.  The policy could not be clearer.  If you're

the first beneficiary, we'll pay you as long as you're

living.  If you're not living, we'll pay the second,

third, fourth, beneficiary.  I mean that's -- it

couldn't be clearer.

            THE COURT:  Mr. Rodio, a question on a point you

made a moment ago, and I'm focusing on the insurance

company's admitted failure to advise your client that

the slayer statute was in play until they finished their

contestability investigation, probably pushed to finish

1    it by your demand letter.   Are there any cases saying

2    that an insurance company has an affirmative duty to

3    advise a beneficiary if there is a question, either a

4    specific question under a slayer's statute -- I guess I

5    have some concerns about saying to someone who the

6    police are telling you is under investigation for murder

7    that you, the insurer, are suspicious that the person is

8    under investigation for murder, that there's a period of

9    time where the insurance company hoping that the police

10   will close the file and arrest somebody else, are

11   reluctant to say to their -- the beneficiary, their

12   insured, we think you're a murderer and there's -- you

13   know, if she really is the murderer, there's a clear

14   downside to saying that.   If she's really not the

15   murderer, there's a clear downside to saying that.   And

16   that therefore with the police actively investigating

17   and saying, as they did in September, hang on, we think

18   we're going to solve this, is there a duty, and are

19   there any cases that talk about the duty that the

20   insurance company finds itself in?   I'm, you know, just

21   looking factually at the situation New York Life found

22   itself in.   I'm finding it hard to criticize them for

23   not believing at some point prior to the filing of the

24   interpleader we have a duty to tell this lady that the

25   slayer statute is either, as you would argue, the only

1   reason for our delay or, as they would argue, moving in

2   tandem with our contestability investigation, and only

3   when the first, the second one runs out, and ends, do we

4   then have no choice but to go public with that

5   accusation?  But I'm uncomfortable with saying that an

6   insurance company has an affirmative obligation to alert

7   the beneficiary in those circumstances.

8         MR. RODIO:  Yeah, and I completely understand,

9   and that's why I thought that -- that's why I mention

10   that I think there are sensitive artful ways of saying

11   that.  I don't know if the insurance company has an

12   affirmative duty to say that, we'll look that up, but

13   here's what I do know, the insurance company has an

14   affirmative duty not to misrepresent to her the reason

15   it's not paying, and that's where we're coming from

16   here, both as a purely legal matter, the insurance

17   company makes a representation, that representation is

18   false, she relies upon that false representation, she

19   goes out and spends money and takes time in reasonable

20   reliance.  That's a pure legal misrepresentation claim.

21   On the equitable side of things, getting back to the

22   initial point I made interpleader is an equitable

23   action, is it equitable to not just not affirmatively

24   represent why you're not paying, but to misrepresent why

25   you're not paying --

1          THE COURT:  Yeah.  So, in other words, you're

2     saying there's a factual dispute here as to whether or

3     not this insurance company five minutes into their

4     contestability investigation knew there's no voidability

5     thing here.

6          MR. RODIO:  Yeah, and --

7          THE COURT:  We're in slayer statute mode and we

8     got to lie to the beneficiary to sort of hold the status

9     quo until we can figure out what to do.

10          MR. RODIO:  I think they've confirmed that.  They

11     didn't get any medical records.  They didn't get any

12     more criminal records, not that they've told us, at

13     least, and now they're willing to pay.  So they got none

14     of the information that withheld payment, supposedly

15     withheld payment for a year, but now they're prepared to

16     pay.  I think -- here's what I think, and it's

17     speculation but it's useable speculation, I think they

18     got my letter.  They said:  Oh, my God, there's a Rhode

19     Island statute that doesn't allow us to void the policy

20     for any misrepresentation, what are we going to do now?

21     And that's when they came up with this interpleader in

22     this supposed contest for the funds.  I think until that

23     point, I think they were just stalling or looking for

24     some misrepresentation unrelated to the manner of his

25     death that could lead them to not pay under the policy,

```
 1   which gets me back to his mom's statement that no one's
 2   going to profit from my son's death.  I mean, the sad
 3   irony here is that the insurance company is the only one
 4   that's profited.  No one would argue that having a
 5   quarter million dollars in a bank account for the last
 6   18 months is not a financial benefit.  So the insurance
 7   company is the one that's profited thus far based upon
 8   this case.
 9        THE COURT:  Well, the insurance company, I think,
10   would probably say no, by the time you're done with
11   attorney's fees and interest, unless I award them their
12   fees, it's truly a wash for them.
13        MR. RODIO:  Well, yeah, and one would hope --
14        THE COURT:  Once they put it into interpleader
15   then I don't think the argument that the insurance
16   company has benefited works all that well.
17        MR. RODIO:  Yeah, if the Court permits them to
18   put it into interpleader, which we resist because we
19   think that all that does is it cuts off the interest
20   obligation and it insulates them from further interest
21   liability for their wrongful actions.  So that's why
22   we're resisting interpleader.  There's no real contest
23   to this fund, your Honor.  There's no real contest.
24   If the Court makes the ruling that, listen 16 months is
25   long enough, because there's no magic to it, 16 months
```

1   isn't long enough, is 18, is 24, is 38?  I mean, we

2   don't know.  But I think it's reasonable to conclude

3   that 16 months is long enough.  If 16 months is long

4   enough, these funds shouldn't go to interpleader, they

5   should go to Ms. Ortiz who's the beneficiary of this

6   policy.  So that's where we are on this interpleader

7   action.  We don't want the insurance company to have the

8   benefit of putting -- we are in a obviously very low

9   interest rate environment, and maybe it doesn't even

10  make sense to put it into an interest bearing account.

11  But we don't think the insurance company should have

12  that benefit because of its interpleader action.  Had it

13  done so, had it filed this interpleader in a couple,

14  three, four, five months, I won't be taking this

15  position.  Had it not misrepresented to her the reason

16  it wasn't paying her, I wouldn't be taking this

17  position.  But this is a very different case.  It's a

18  very different case from the one that -- actually, it's

19  been an interesting legal research because you don't

20  very often to get to read about murders and things like

21  that.  I don't know if your Honor saw that Judge Posner

22  case that there was a Nicole Kidman movie To Die For and

23  she had teenagers murder her husband.  It sounds exactly

24  -- that Judge Posner case sounds exactly like that, wife

25  has an 18 year old and two 16 year old accomplices

1    murder her husband and then she's not entitled -- of

2    course she was a convicted murderer at the time the

3    Court made its decision so it's really not applicable to

4    this case, but the question becomes who then takes the

5    insurance policy.  But Hovis, I mean Hovis doesn't help

6    the insurance company at all here.  Hovis is a case

7    where an insurance salesman sells an elderly widow a

8    policy, two years later goes back to his company, when

9    she's on her deathbed and says she wants to add me as a

10   beneficiary, there's an internal investigation because

11   they don't allow their salesmen to get on policies

12   unless there's approval, she dies while the

13   investigation is going on, it's later approved, and then

14   there's an issue of was it really her signature.  We

15   can't tell because she was so old and elderly.  I mean,

16   those are compelling facts for an interpleader.  We

17   didn't pay this lady and didn't tell her why, in fact

18   misrepresented why for a year, and now we have a

19   different theory, those are not compelling facts for an

20   interpleader.

21          THE COURT:  Yeah.  I'll tell you candidly,

22   Mr. Rodio, I find this is a good interpleader case so

23   that the real thing that's of concern to me is whether

24   there's a period of time where the insurance company

25   knows there's no voidability issues yet the police are

1    stringing them along on the investigation, making them

2    think we're going to close this investigation, which

3    would give clarity, eliminate the problem.  So they

4    delay for a period of time where they're no longer

5    really worried about contestability.  That period is

6    fairly short, so really does it really get us into the

7    laches zone?  And then they file the interpleader.  It's

8    hard for me to -- I'm going to do a deep dive and I want

9    to go read all the cases, and I may change my mind on

10   this, but my reaction at the moment is that this is a

11   paradynamic interpleader situation with enough evidence

12   that the slayer statute may ultimately be found

13   appropriate as to your client, and a secondary

14   beneficiary very passionate about those issues.  I don't

15   see that the insurance company had any choice.  I mean,

16   I don't think one of the reasonable choices on the table

17   for the insurance company was pay the policy to

18   Ms. Ortiz.  So the real issue is, what's the legal

19   significance of a factual dispute regarding whether at

20   some point the contestability investigation was really

21   petering out and yet they don't initiate the

22   interpleader because the police are telling them we're

23   going to solve it.

24          MR. RODIO:  Well, understood, your Honor, and the

25   only point I would make to that is if the Court does

1    allow the interpleader that does not mean that the seven

2    counts that we've raised, for breach of contract, bad

3    faith, et cetera, et cetera, go away.  That does not

4    implicate the interpleaded fund.  Those are separate and

5    apart from the interpleaded funds, so I'm not sure how

6    --

7            THE COURT:  Yeah --

8            MR. RODIO:  -- I'm not sure how New York Life

9    reaches that far in this case.

10           THE COURT:  Okay.

11           MR. RODIO:  Thank you, your Honor.

12           THE COURT:  All right, thank you.  I think

13   Mr. Magratten will be seeking what might be the last

14   word, maybe not?

15           MR. MAGRATTEN:  Just briefly, your Honor.

16   Ms. Ortiz is advancing the argument that it was obvious

17   the medical records was a red-herring here.  But I think

18   the -- what the handicap that the Court and all the

19   parties are operating under is we just don't know the

20   circumstances of death.  You can envision a

21   hypothetical, for example, where Mr. Kaydea died in a

22   drug deal gone bad, and one of the questions, medical

23   questions is do you have any history of drug abuse, have

24   you taken any illicit medication -- any illicit drugs,

25   and he said no.  Medical records intending to show a

1  history of drug abuse could be quite relevant to this,

2  and support a policy recision.  So I think it's an

3  overstatement to say that medical records here, the

4  search for medical records was completely immaterial.

5      Mr. Rodio said, and I think this is an important

6  point to clarify, Mr. Rodio said that to date the

7  insurance company has only given the broadest outline of

8  its investigation.  As part of New York Life's Rule

9  26(a)(1) initial disclosures, New York Life has provided

10  its complete file on this.  In a privilege log, there's

11  some attorney/client information in there that was

12  redacted but basically all parties now, and it's all --

13  the complete file is attached to the motion papers so

14  the Court and all parties have New York Life's complete

15  file on this.  The only additional information that

16  could be obtained about the investigation will be

17  perhaps the interviews or depositions of the

18  investigator or New York Life's staff.

19      And, finally, there's been this argument about a

20  misrepresentation that at some point New York Life told

21  Ms. Ortiz the only reason we're not paying you is you

22  haven't given us medical records yet.  But I think if

23  the Court looks, and the file contains the actual

24  correspondence, I'm looking at a June 4 letter from New

25  York Life to Ms. Ortiz.  What New York Life says is:  We

1    are writing regarding the pending death claim under the

2    above-captioned policy.  We are in the process of

3    conducting inquiries that include obtaining copies of

4    the insured's medical records from the doctors and

5    hospitals that treated the insured.  As soon as our

6    inquiries are completed, you will be hearing from us

7    further regarding the matter.  I think it's a stretch to

8    infer from that language that New York Life is telling

9    her, Look, the only reason you're not being paid is you

10   haven't given us medical records.  They cite that as one

11   of the things they're looking at.  But that's -- I don't

12   think that supports the misrepresentation.

13          THE COURT:  One question, Mr. Magratten.  If this

14   were a situation where we weren't in the contestability

15   period, but New York Life gets the death certificate and

16   goes, oh, murder, makes a phone call to the police and

17   learns that the beneficiary they're about to cut the

18   check to is a person of interest in connection with the

19   murder investigation, but you're not in the

20   contestability period, how long does the insurance

21   company have to initiate an interpleader proceeding

22   without being tagged with laches?

23          MR. MAGRATTEN:  I would argue that the relevant

24   issue there is not so much time but activity.  I would

25   argue that the burden then falls on the insurer to

1    maintain contact with authorities, gather as much

2    information about the case implicating the beneficiary

3    in the murder, and as long as there's reasonable hope

4    that more information is coming, that there will be an

5    arrest, or that there won't be an arrest, or that the

6    beneficiary is going to be exculpated, I think the

7    problem would lie where you have a life insured that's

8    doing nothing and just waiting for the police department

9    to call and say, okay, you can cut the check.  But I

10   think as you look through the claim file you'll see

11   there's a fairly steady stream of activity through the

12   spring of 2013 into early 2014, frequent contact with

13   investigators.  They're reaching out -- unfortunately

14   they're just getting the same line which is it's a very

15   active investigation, it's ongoing, no one can be ruled

16   out.  I think in the backdrop to the original statement

17   from investigators, or from the authorities, that

18   Ms. Ortiz was a person of interest, I think New York

19   Life, or any insurer in that situation, acts reasonably

20   not to pay the claim immediately to see how the

21   investigation turns out.

22            THE COURT:  All right, thank you.

23            MR. RODIO:  Can I just make one point?

24            THE COURT:  Yeah, I was going to give you --

25            MR. RODIO:  Oh, thank you.

```
 1          THE COURT:  -- the real last word, and I also had
 2     a couple of minor questions for you, so --
 3          MR. RODIO:  Yeah.  I just did want to point out
 4     that Ms. Ortiz's affidavit, at paragraph 13, says
 5     beginning in May of 2013 New York Life repeatedly
 6     informed both me and my attorney that it needed medical
 7     records, I'm paraphrasing at this point, before it could
 8     pay me death benefits.  And then the very next
 9     paragraph, 14, uncontested.  Before filing this suit,
10     New York Life stated no other reason for refusing to pay
11     me the policy benefits.  So that is on the record, your
12     Honor.  I just wanted to point that out.
13          THE COURT:  Okay.  Don't sit down.  The
14     undisputed fact regarding the routine nature of the
15     investigation, what I said at the beginning to Mr.
16     Magratten is that, and would you agree that this is
17     what's undisputed, that the very first letter that went
18     to your client, I think May 2nd of 2013, which appears
19     to me to be a routine contestability period letter, that
20     says sorry for the loss, obviously they have no idea
21     that this lady hasn't lost anything.  She's no longer
22     even in contact with this guy, so it looks like a
23     routine letter, and then the investigation moves, and I
24     think Mr. Magratten agrees that it becomes non-routine
25     later in the investigation.  So I think your factual
```

1  dispute with regard to that word routine, my question is

2  whether you would agree that it's undisputed that at

3  least as of

4  May 2 of 2013 this was routine.

5          MR. RODIO:  Yeah, I think that's a question

6  for -- probably, but I do think that's a question for an

7  industry expert.  If and when this case goes to trial, I

8  expect that we'll put somebody on the stand to say this

9  is how these matters are typically handled within the

10  industry, and I expect that that person will say, you

11  know, within a month, whatever it was, quote/unquote,

12  routine, it should have been very evident to New York

13  Life that it was no longer routine.

14          THE COURT:  Yeah.  I mean clearly that's

15  disputed.

16          MR. RODIO:  Right.

17          THE COURT:  But that that initial, you know,

18  three days after your client had contacted them --

19          MR. RODIO:  Yeah, I don't think you can fault

20  them.

21          THE COURT:  -- it's routine.

22          MR. RODIO:  I don't think you can fault them.

23          THE COURT:  And here's my other question.  If the

24  Court, if I recommend the interpleader, I want to make

25  sure that I deal with the interest bearing versus

1    non-interest bearing issue.  From your client's

2    perspective, would you, if we get to that point, and

3    that's the recommendation that I make, would you want me

4    to recommend that before a final order is entered the

5    Court give you the opportunity to make a decision as to

6    whether or not it goes to interest bearing with fees

7    that may wipe out the interest or that it go straight

8    into Claire Parvin's account and does not carry

9    interest?

10        MR. RODIO:  Yes, we would appreciate that

11   opportunity.  Or, and I don't even know if this is

12   within the Court's purview, but or an opportunity to put

13   the funds in a joint account at Merrill Lynch or at

14   Fleet National Bank, requiring signatures of all the

15   parties to remove it where maybe the fees wouldn't be

16   the same and maybe there would be a little more interest

17   I don't know.

18        THE COURT:  Yeah, I don't -- Mr. Magratten you

19   may know whether that's something that works in the

20   world of interpleader.

21        MR. MAGRATTEN:  I think that's a little outside

22   the usual interpleader box.

23        THE COURT:  Yeah.

24        MR. MAGRATTEN:  I can tell you, I think New York

25   Life would prefer not to go down that road.  That would

1    require it to have an attorney involved, signing off on

2    documents and --

3              THE COURT:  And more expense.

4              MR. MAGRATTEN:  Paperwork and more expense, yes.

5              THE COURT:  Yeah.  All right.

6              MR. RODIO:  Although we hope Mr. Magratten stays

7    with us, your Honor.

8              THE COURT:  Well, I understand that.  And he

9    hopes he doesn't.  And I can't tell you one way or the

10   other because we will take this under advisement.

11   Frankly I think Judge McConnell recently published a

12   decision in the insurance context that said who said

13   insurance law is boring.  I think this case illustrates

14   that point, perhaps even more so.  So I will be taking

15   this under advisement.  It will take me some time

16   because I want to really go deeply into the facts, map

17   them out and look at all of the cases you've cited and

18   probably do some research of our own.  But we'll try to

19   get you a decision within a reasonable period of time.

20             MR. RODIO:  Thank you, your Honor.

21             MR. MAGRATTEN:  Thank you, your Honor.

22             THE COURT:  All right, Court will be in recess.

23   (RECESS)

24

25

1

2

3

4

5

6

7

8

9                    C E R T I F I C A T E

10

11

12    I, court-approved transcriber, certify that the

13    foregoing is a correct transcript from the official

14    electronic sound recording of the proceedings in the

15    above-entitled matter.

16

17

18

19    /s/JOSEPH A. FONTES

20    COURT REPORTER

21

22    NOVEMBER 4, 2014

23

24

25